Squire SCOTT, Clarence Thomas, Philip Alley, Joe Bess, John Boston, Robert Cruikshank, Jesse Davis, Henry Dean, Otis Glenn, Wilbert Grant, Alphonce Jackson, Frank Jackson, Clarence Livingston, Howard Moore, James Pointer, Lester Savage, Malcolm Smith, Roney Vanley, Marshall Walker, David Washington, Samuel Wells, William Yray, Plaintiffs-Appellants,

v.

PACIFIC MARITIME ASSOCIATION; International Longshoremen's and Warehousemen's Union [I.L.W.U.]; Local 10, I.L.W.U.; Local 34, I.L.W.U., Defendants-Appellees.

Nos. 81–4243, 81–4364.

United States Court of Appeals, Ninth Circuit.

Argued and Submitted Aug. 10, 1982.

Decided Jan. 7, 1983.

As Amended May 2, 1983.

---

David H. Schwartz, Hill & Hansen, San Francisco, Cal., for Scott.

William L. Robinson, San Francisco, Cal., argued for Pacific Maritime; Norman Leonard, Lillick, McHose & Charles, San Francisco, Cal., on brief.

Before ANDERSON and REINHARDT, Circuit Judges and JAMESON,* District Judge.

JAMESON, District Judge:

Plaintiffs-appellants appeal from a judgment holding that they failed to establish a violation of Title VII and 42 U.S.C. § 1981 based on racial discrimination in employment. We affirm.

---

* The Honorable William J. Jameson, Senior United States District Judge for the District of Montana, sitting by designation.

## I. Background

Plaintiffs-appellants are 20 black and one Asian/Pacific Islander longshoremen who brought this action seeking relief under Title VII (42 U.S.C. § 2000e, *et seq.*) and 42 U.S.C. § 1981 for discrimination in employment due to race. Defendants-appellees are the Pacific Maritime Association (PMA), International Longshoremen's and Warehousemen's Union (ILWU), Local 10 of ILWU, and Local 34 of ILWU. PMA is a collective bargaining agent and association of marine employers consisting of shipping, stevedoring, and terminal companies operating on the Pacific Coast. PMA's members employ longshoremen, ships clerks, and other dock workers. ILWU is a labor organization representing longshoremen, ships clerks, and other workers in the United States and Canada. Local 10, is an ILWU affiliate which represents *longshoremen* in the ports of San Francisco and Oakland. Local 34 is an ILWU affiliate which represents ships *clerks* in San Francisco, Oakland, and other ports in Northern California.

Longshoremen and ships clerks are the two principal job categories associated with the loading and unloading of sea borne cargo. Longshoremen perform the actual loading and unloading of the cargo; the clerks perform the associated record keeping functions and ensure proper positioning of cargo.

All of the defendants are parties to a single collective bargaining agreement - the ILWU - PMA Pacific Longshore and Clerks Agreement - which is in turn embodied in the Pacific Coast Longshore Contract Document and the Pacific Coast Clerks Contract Document. These documents set forth the terms and conditions of employment of longshoremen and clerks. Because of the often unpredictable level and sporadic nature of work in the waterfront industry on the Pacific Coast, workers are classified in three groups, giving priority to certain workers in the assignment to available jobs. This system has been in existence since the 1950's.

### A. Registration System

. Class A registered workers have first priority to the type of work (either clerk or longshore) for which they are registered. Only "A" registered clerks are eligible for membership in Local 34 and only "A" registered longshoremen are eligible for membership in Local 10. A pay guaranty plan in the collective bargaining agreement ensures "A" workers a minimum weekly amount so long as they make themselves available for work, whether or not work is available.

Class B registered workers have second priority to the type of work for which they are registered. "B" workers are covered by the pay guaranty plan at a lower level.

Registration of "B" workers, whether longshoremen or clerks, begins with a decision by the appropriate joint labor-management port committee that work opportunity justifies the addition of new workers to the existing pool of both "A" and "B" workers. Applicants for partial or "B" registration are solicited from the community at large. After successfully completing a screening process they are "B" registered. Class B longshoremen and clerks receive second preference in dispatch and function somewhat as apprentices before being advanced to "A" status and full membership in the Union. Class B workers are advanced in the order of their registration.

"Casual" or "Social Security" workers are not registered in the industry and can receive job assignments only after "A" and "B" workers have been given an opportunity to take available jobs. They are not included in the pay guaranty plan.

### B. Tripartite Agreement

In 1972, following a severe curtailment of job opportunities, the defendants entered into a Tripartite Agreement to reduce pay guaranty plan payments to longshoremen.[1]

1. Earlier in 1972 PMA had agreed to a Pay Guaranty Plan which guaranteed wages for

"A" registered members equal to 36 hours

Extra clerk-type work would be given to idle longshoremen by dispatching 35 longshoremen out of the clerk's hall to clerk jobs.

These 35 "extra clerks" or "longshore clerks" would be dispatched after the class A and B clerks, but would retain their class A status in Local 10. The district court found that it was the understanding of PMA that those assigned to work under the Tripartite Agreement would be disabled longshoremen who, unable to perform the strenuous tasks required of their longshore jobs, would otherwise collect large amounts from the pay guaranty plan. A significant number of longshore clerks, however, are not disabled.

The plaintiffs are all class A *longshoremen,* members of Local 10, who have been working as *longshore clerks*[2] out of the clerk's hall pursuant to the Tripartite Agreement. The plaintiffs claim that the failure to give them class A status in Local 34 (clerks) ahead of class B *clerks* and even more senior class A longshoremen constitutes impermissible racial discrimination.

### C. *Membership in Local 34*

There are two principal ways of acquiring full membership in Local 34: First, Class A longshoremen with five years of full registration may be eligible to apply for transfer to Class A registered clerk status and retain all seniority, pension, welfare, vacation and dispatch preference.[3] Due to depression in the waterfront industry, Local 34 (clerks) needed to undergo an attrition in its membership. As a result, the last transfer of Class A longshoremen to Class A clerk status occurred in 1970.[4] Second, Class B clerks may be advanced to Class A status. The last Class B list was established in 1969 and was 18% black.[5]

### D. *Permissive Rule*

The "permissive rule," which is applicable to all longshore and clerk locals on the Pacific Coast, provides that the son or daughter of a deceased longshoreman or clerk is to be granted Class B registration if he or she is the sole support of the deceased's widow, is over the age of 18 years, and applies within 30 days of the father's death or within 30 days after reaching 18. Since the adoption of the rule in 1963 only 18 persons were partially registered as Class B clerks by Local 34 pursuant to this rule.

### II. *Proceedings Below*

Squire Scott filed a charge of racial discrimination with the Equal Employment Opportunity Commission on July 27, 1978. Similar charges by the other plaintiffs followed. In August, 1979, plaintiffs received a right to sue in federal court, and the original complaint was filed 90 days thereafter. On the day before trial, defendants moved for partial summary judgment on the grounds, among others, that (1) the claims of those plaintiffs who did not timely file or failed to file with the EEOC should be dismissed, and (2) the scope of the action should be limited to those claims based on the operation of the permissive rule. The motions were denied. Following a court trial and the submission of post-trial briefs, a judgment of dismissal was entered.

In a thorough and well considered memorandum the district court concluded, *inter alia,* that (1) even assuming the Class B list established in 1969 was fashioned discriminatorily, "plaintiffs' claim of disparate impact would fail since that list has not been used as a source of "A" clerks within the

work and for "B" registered members wages equal to 24 hours per week.

2. As of January 1, 1980, 80% of the longshore clerks were black.

3. Supplement II of the Pacific Coast Longshore Contract Document and the Pacific Coast Clerks Contract Document sets forth the provisions of transfer. Ultimate control is vested in

a single Joint Coast Labor Relations Committee.

4. A transfer from longshoreman to clerk status is considered a promotion.

5. When the Joint Coast Labor Relations Committee determines that more partially registered workers are needed, they are recruited from the community at large.

statutory period;"[6] (2) plaintiffs had failed to make an "initial showing of disproportionate impact in the operation of the permissive rule;" and (3) plaintiffs "failed to establish that the defendants intentionally discriminated against them because they were black." The court observed further that "it appears to the court that it is plaintiffs' status as longshoremen which is the core of this controversy, not plaintiffs' race." Accordingly the court held that the plaintiffs were "unable to establish a violation of Title VII and 42 U.S.C. § 1981."

### III. Contentions on Appeal

Appellants contend that (1) the court erred in failing to apply the "continuing violation" doctrine to plaintiffs' claims of discrimination in promoting to "A" or fully registered status in Local 34; (2) the defendants' practice of advancing "B" clerks to "A" status rather than transferring longshore clerks (including plaintiffs) was racially discriminatory under the "disparate impact" theory; and (3) the permissive rule giving preference to relatives of a predominantly white union was discriminatory.

Appellees contend that (1) the "continuing violation" doctrine was not asserted in the district court and may not be raised on appeal; (2) the doctrine is inapplicable and the Title VII claims are time barred; (3) the application of a disparate impact analysis is inappropriate; (4) the defendants' practice of advancing "B" clerks to "A" status is part of a *bona fide* seniority system and the court properly found an absence of intent to discriminate; and (5) the court properly found that the permissive rule is not discriminatory.

### IV. Continuing Violation Doctrine

The district court found that under 42 U.S.C. § 2000e–5(e) the statute of limitations commenced running on plaintiffs Title VII claims on September 29, 1977, 300 days prior to the filing of the charge. The last member from the 1969 "B" list promoted to "A" status was advanced on September 17, 1977, "12 days prior to the first day on which Title VII liability can be predicated." The only persons to attain "A" status after that date were two persons registered pursuant to the permissive rule.

Appellants argue that since the plaintiffs had continued working as longshore clerks the "promotion of 'B' men, even though occurring outside the statute of limitations period, constituted a continuing violation which remained actionable and on which relief could be granted."

### A. Was Issue of Continued Violation Raised in Trial Court?

■ As a general rule issues which have not been raised in the trial court will not be reviewed on appeal. See, *e.g., Wellman v. Jellison,* 593 F.2d 876, 879 (9 Cir.1979); *United States v. Plechner,* 577 F.2d 596, 598 (9 Cir.1978). Appellees contend that appellants did not assert the theory of continued violation in pretrial proceedings or at the trial, but rather relied upon their contention that liability under Title VII should be assessed from July 27, 1976 (two years prior to the filing of EEOC charges) and under 42 U.S.C. § 1981 from October 1, 1976 (three years prior to the filing of suit).

Appellants argue that they did raise the continuing violation doctrine issue at page 7 of Plaintiffs' Trial Brief: "The Discrimination Complained of by Plaintiffs Constitutes a 'Continuing Violation' Entitling Plaintiffs to Back Pay from July 27, 1976." Appellees respond that this discussion pertains to back pay only and that during the trial the continuing violation theory was never mentioned and the court was told repeatedly by appellants' counsel that particular statutory periods were relevant.[7]

**6.** 42 U.S.C. § 2000e–5(e) provides that a charge must be filed "within 300 days after the alleged unlawful employment practice occurred."

**7.** In response to a question from the court relative to the "appropriate point of beginning" and the "past history," counsel for appellants responded in part: "Okay, we have two periods that we think are relevant. One is from October 3, 1976, which is our three year statute

The continuing violation theory was not asserted in the Joint Pretrial Statement;[8] nor was it mentioned in the district court's detailed and well reasoned memorandum.[9] In resolving plaintiffs' claim of disparate impact, the district court was concerned with the applicable statute of limitations. Relying upon *Love v. Pullman,* 404 U.S. 522, 92 S.Ct. 616, 30 L.Ed.2d 679 (1972), the court concluded that the 300-day statute of limitations was applicable "when the EEOC, acting on behalf of the complainant files with the state agency and defers until it has completed its investigation." Noting that this "is precisely the situation here," the court concluded that "the statutory period excludes liability for discriminatory acts occurring before September 29, 1977." The last promotion from the 1969 "B" list occurred 12 days prior to that date. The issue before the district court was not the applicability of the continuing violation doctrine, but rather determining the first day on which liability could be predicated under the applicable statute.

■ Appellants argue that the issue of "continuing violation" is a legal theory relating to the question of whether their claims were time-barred, and that they "clearly stated to the trial court both before and after trial that they were relying on the doctrine of continuing violation to toll any statute of limitations." It is true that the briefs referred to a continuing violation, and to that extent *Milton v. Weinberger* (note 9) may be distinguished. The focus of appellants' argument in the trial court, however, was on the dates when the statute began to run. In view of counsel's responses to questions from the court (see note 7), and the fact that the continuing violation doctrine was not even mentioned in the pretrial statement or the district court's memorandum, we cannot agree that the continuing violation doctrine was an issue properly raised or considered by the trial court.

## B. Application of the Continuing Violation Doctrine

Assuming, *arguendo,* that the references to continuing violations in appellants' trial briefs were sufficient to raise this issue in the trial court, is this a proper case for application of the continuing violation doctrine?

The continuing violation doctrine was considered by the Supreme Court in *United Air Lines, Inc. v. Evans,* 431 U.S. 553, 97 S.Ct. 1885, 52 L.Ed.2d 571 (1977). Evans, a female flight attendant had been dis-

---

under 1981. And from October 3, we have had 18 men elevated to 'A' status, promoted to 'A' status ... Our second period is from July 27, 1976, which is two years before the filing of the first charges of discrimination with the EEOC."
    In further explanation of plaintiffs' position, counsel said: "The defendants have gone off on what we consider a tangent by saying that if these jobs are there, they should go to the membership of Local 10. But that is not what we are talking about. We are talking about the promotions that occurred during the statutory periods and we are saying that they should have gone to our men, who were there and were working and were qualified for the job.... Evidentiary wise we look at what is happened from 1969 to the present. We look at the 1965 and 1970 transfers, realizing that the remedy which we are seeking is governed from the time period of July 27, or October 3 to the present."

**8.** The Pretrial Order provided that the disputed factual issues and points of law were those stated by the parties in the Joint Pretrial Statement. Fed.R.Civ.P. 16 provides that this order

"limits the issues for trial to those not disposed of by admissions or agreements of counsel and such order, when entered controls the subsequent course of action..." See also *Shah v. Mt. Zion Hospital Medical Ctr.,* 642 F.2d 268, 271 (9 Cir.1981), where the court declined to consider an issue raised on appeal which was not included in the pretrial statement.

**9.** In *Milton v. Weinberger,* 645 F.2d 1070, 1076–1077 n. 16 (D.C.Cir.1981), the court, in finding that plaintiffs had failed to argue in the trial court that they were "suffering under a continuing policy of discrimination" noted that: "We can find nothing in the record of the proceedings before the District Court to indicate that the appellants were relying on a theory of 'continuing violations'. Indeed, everything that we have examined points to the opposite conclusion. It is also worth noting that the opinion of the District Court, which offers a thorough and thoughtful analysis, never once even suggests that appellants had asserted a theory of continuing violations."

charged in 1968 pursuant to United's "no marriage" policy. A subsequent collective bargaining agreement ended the "no marriage" rule. Evans was hired as a new employee in 1972, without receiving credit for prior service. She brought suit, seeking relief under Title VII. The district court dismissed her complaint, holding that the failure to file a charge within 90 days of her 1968 discharge foreclosed relief under Title VII. The court of appeals reversed. On appeal to the Supreme Court, Evans contended that United was guilty of "a present, continuing violation of Title VII and therefor that her claim is timely." *Id.* at 557, 97 S.Ct. at 1888. In holding that the district court had properly dismissed the action, the Court said in part:

> ... A discriminatory act which is not made the basis for a timely charge is the legal equivalent of a discriminatory act which occurred before the statute was passed. It may constitute relevant background evidence in a proceeding in which the status of a current practice is at issue, but separately considered, it is merely an unfortunate event in history which has no present legal consequences.

> Respondent emphasizes the fact that she has alleged a *continuing* violation. United's seniority system does indeed have a continuing impact on her pay and fringe benefits. But the emphasis should not be placed on mere continuity; the critical question is whether any present *violation* exists....

*Id.* at 558, 97 S.Ct. at 1889.

In *Delaware State College v. Ricks,* 449 U.S. 250, 101 S.Ct. 498, 66 L.Ed.2d 431 (1980), a college professor complained under civil rights law that he had been denied tenure because of his native origin. The district court dismissed the action because Ricks had not filed his Title VII charge with the EEOC within 180 days of the date Ricks was notified that he would be offered a one-year "tenure" contract, and that he had not filed the § 1981 claim in the district court within the applicable three-year statute of limitations. The court of appeals reversed, holding that the statute did not begin to run until the "tenure" contract

expired. In remanding for reinstatement of the order of dismissal, the Court noted that Ricks in effect was claiming a "continuing violation" of the civil rights laws. The Court held, however, that "Mere continuity of employment, without more, is insufficient to prolong the life of a cause of action for employment discrimination." *Id.* at 257, 101 S.Ct. at 504. The Court said further:

> ... Where, as here, the only challenged employment practice occurs before the termination date, the limitations periods necessarily commence to run before that date. It should not be forgotten that time-limitations provisions themselves promote important interests; "the period allowed for instituting suit inevitably reflects a value judgment concerning the point at which the interests in favor of protecting valid claims are outweighed by the interests in prohibiting the prosecution of stale ones." *Johnson v. Railway Express Agency, Inc.,* 421 U.S. [454] at 463–464 [95 S.Ct. 1716, 1721–1722, 44 L.Ed.2d 295]. See *Mohasco Corp. v. Silver,* 447 U.S. 807, 820, 825, 100 S.Ct. 2486, 2494, 2496, 65 L.Ed.2d 532 (1980).

*Id.* at 259–60, 101 S.Ct. at 505.

The effect of the decision of the Supreme Court in *Evans, supra,* was considered by this court in *Reed v. Lockheed Aircraft Corp.,* 613 F.2d 757 (9 Cir.1980), in drawing a distinction between continuing impact and continuing violation. The opinion in *Reed* quoted from the *Evans* decision holding that the "emphasis should not be placed on mere continuity: the critical question is whether any present *violation* exists." The opinion in *Reed* continued:

> For the purposes of this action, then, the critical question is whether Lockheed, within 300 days of Reed's filing her charge, engaged in the unlawful conduct of failing to promote women in situations where men would be promoted. The *Evans* decision held merely that continuing *impact* from past violations is not actionable. Continuing violations are.

*Id.* at 760. See also *London v. Coopers & Lybrand,* 644 F.2d 811, 815–816 (9 Cir.1981).

Both parties rely upon language in *Williams v. Owens-Illinois, Inc.,* 665 F.2d 918 (9 Cir.1982), an employment discrimination action alleging discrimination on the basis of sex and race. The district court had granted summary judgment for the employees. In concluding that remand was necessary with respect to most of the claims the court said in part:

> ... On remand, evidence of discriminatory acts relating to placement or promotion of blacks and women occurring before the applicable limitations period may be admitted for the purpose of attempting to show continuing violations having an effect on the concerned employees within the limitations period.

*Id.* at 925.

The court's conclusion was clarified in a footnote which reads:

> We emphasize that a continuing violation exists only if Owens-Illinois' promotion *policy* was discriminatory and continued in effect into the permissible limitations period. A continuing violation should be distinguished from the continuing *impact* of a past, yet discrete and no longer existent discriminatory act. The fact that some employees were harmed by the continuing *impact* of Owens-Illinois' discrete incidents of prior discrimination that occurred before the limitations period is not sufficient. *Compare United Air Lines Inc. v. Evans,* 431 U.S. 553, 558, 97 S.Ct. 1885, 1889, 52 L.Ed.2d 571 (1977) (continuing impact of past violation not actionable) with *Reed v. Lockheed Aircraft Corp.,* 613 F.2d at 760 (mere continuing impact must be distinguished from continuing violations; continuing violations are actionable, continuing impact from a past violation is not).

*Id.* at 925, n. 3.

■ To meet the continuing violation standard of *Williams,* the policy of promo-

tion of "B" list persons must have continued in effect into the permissible limitations period. The last member from the 1969 "B" list promoted to "A" status was advanced on September 17, 1977. The only persons to attain "A" status after that date were two persons registered pursuant to the permissive rule. Thus, there is no evidence to support appellants' contentions that this is an ongoing policy. Rather the evidence shows that the "B" list has not been used for any purpose since the September 17, 1977 advancement. Accordingly, we conclude that assuming, *arguendo,* the references to continuing violations in appellants' trial briefs were sufficient to raise this issue in the trial court, this is not a proper case for application of the continuing violation doctrine as there is no evidence that the policy of promotion of "B" list persons continued in effect into the permissible limitations period.[10]

## V. *Permissive Rule*

The only remaining basis for appellants' claims of liability under Title VII would be the operation of the permissive rule. As noted above, only 18 persons have been partially registered as Class B clerks by Local 34 pursuant to this rule. The district court found that the evidence introduced at trial revealed that the permissive rule is facially neutral; that it applies to all longshore and clerk locals along the Pacific Coast and is intended to further humanitarian goals; and that the permissive rule was initially adopted for the longshoremen whose unions are predominantly non-white. The court concluded, therefore, that the proper framework for analysis of this facially neutral rule is the disparate impact test. Neither party disputes this finding.

In the recent case of *Connecticut v. Teal,* —— U.S. ——, 102 S.Ct. 2525, 2531, 73

---

10. Since we have concluded that even if the continuing violation issue was properly raised below there was no such violation, we do not reach appellees' contention as a defense to any such violations that the practice of advancing Class B clerks to Class A clerk status is an integral part of a *bona fide* seniority system.

Similarly, we do not reach the issue of application of the disparate impact analysis because the claim is time-barred, and we have found that there is no continuing violation.

L.Ed.2d 130 (1982), the Court set forth the tests to be applied in disparate impact claims:

Griggs [*Griggs v. Duke Power Co.,* 401 U.S. 424, 91 S.Ct. 849, 28 L.Ed.2d 158 (1971)] and its progeny have established a three-part analysis of disparate impact claims. To establish a prima facie case of discrimination, a plaintiff must show that the facially neutral employment practice had a significantly discriminatory impact. If that showing is made, the employer must then demonstrate that "any given requirement [has] a manifest relationship to the employment in question," in order to avoid a finding of discrimination. *Griggs, supra,* at 432, 91 S.Ct., at 854. Even in such a case, however, the plaintiff may prevail, if he shows that employer was using the practice as a mere pretext for discrimination.

The trial court found that

As plaintiffs introduced no evidence on the racial breakdown of those 18 individuals registered pursuant to the permissive rule, we are unable to evaluate any claim that the use of such a rule had disproportionate adverse impact upon plaintiffs as a group of black longshoremen.

Appellants assert that the trial court "mistakenly believed that no evidence was presented giving the racial breakdown of persons registered under the permissive rule." They point out that Defendants' Trial Exhibit D–48 provided a summary of the registration of all clerks from 1963 to 1980. Plaintiff did not, however, introduce any independent evidence to show the racial background of those registered pursuant to the permissive rule since 1963 or evidence as to the statistical significance of the race of those registered under the rule.

The district court did note that plaintiffs introduced evidence that of the five persons registered under the permissive rule who had been advanced to Class A status since October 3, 1976, all are white; and that since October 3, 1976, three individuals were partially registered under the permissive rule - two of whom were white, and one black. The court recognized that "It is well established in this circuit and many others that statistical evidence derived from an extremely small universe has little predictive value and must be disregarded," citing *Morita v. Southern California Permanente Medical Group,* 541 F.2d 217, 220 (9 Cir.1976), *cert. denied,* 429 U.S. 1050, 97 S.Ct. 761, 50 L.Ed.2d 765 (1977).[11]

The district court was unwilling "to speculate that the permissive rule operates to perpetuate the exact same racial balance that exists in the fully registered workforce of Local 34."[12] We find that the record supports the court's analysis of the statistical evidence:

According to defendants, Local 34 is approximately 11% black. We are not willing to assume that the permissive rule will operate to perpetuate the 89% nonblack membership of Local 34 or that of the 18 clerks registered since 1963, their racial breakdown matches that of the union of those years. First, the permissive rule applies only to the children of deceased clerks who were *active* at the time of their death. Neither party introduced any statistics of the racial breakdown of the active clerks over the years preceding this lawsuit. Second, there is no evidence that the present racial composition of Local 34 is imbalanced. Although the parties entered into evidence statistical analysis relating to the proportion of

---

**11.** In *Morita,* the court held that evidence that, of eight promotions, only one went to a minority, was numerically too small to have any significant benefit to plaintiff's case.

**12.** Appellants urge that the opinion testimony of James Herman, former president of Local 34 and now president of the International Union, should be given great weight and constituted

evidence of what the racial composition of Local 34 would have been but for the reduction in work force on the San Francisco/Oakland waterfront occasioned by containerization. But even if the trial court failed to consider this testimony, we do not find the testimony alone sufficient to meet plaintiffs' burden of proof as mandated by *Connecticut v. Teal, supra.*

blacks expected to have been in the applicant pool for the 1969 "B" list, this evidence was based upon the 1970 census data. We do not have more recent census data or other expert opinion on which to base a finding that blacks were underrepresented on the current workforce of Local 34.

Our conclusion that plaintiffs have not made an initial showing of disproportionate impact in the operation of the permissive rule is bolstered by other factors. First, the permissive rule operates regardless of the size of the workforce; that is—an individual registered under this rule does not necessarily fill an "opening" in Local 34. His registration is mandatory, if he desires to invoke the permissive rule, whether there is an opening or not. Thus, this provision is merely a supplement to the principal sources of clerks, rather than a major alternative method. Second, since 1963, approximately 532 individuals have been either fully or partially registered with Local 34; only 18 of these were registered under the permissive rule. The rule therefore amounts to only 3.4% of the additions to Local 34 workforce over the past 18 years. The effect of the rule, therefore, upon individuals in plaintiffs' situation is de minimis.

We agree with the district court that appellants failed to make a prima facie showing of disproportionate impact in the operation of the permissive rule.

VI. Conclusion

We conclude that (1) the doctrine of continuing violation was not properly raised and considered in the district court; (2) assuming, arguendo, that the issue was raised in the district court, the doctrine is not applicable to appellants claims; (3) appellants' claims based upon alleged discrimination in the advancement of clerks from the 1969 "B" list are barred by the statute of limitations; (4) appellants have failed to make a prima facie case of disparate impact discrimination in the use of the permissive rule; and (5) appellants have failed to establish a violation of Title VII and 42 U.S.C. § 1981. We affirm the decision of the district court.[13]

AFFIRMED.[14]

13. The union defendants filed a notice and an amended notice of cross-appeal from the order of the district court denying an award of attorney fees. It appears that the cross-appeal has been abandoned. In any event, it is untimely.

14. Judge Reinhardt concurs in the result, but was unable to participate in the formulation of this Opinion.