John E. PATTERSON, et al., Plaintiffs,

v.

NEWSPAPER AND MAIL DELIVER-
ERS' UNION OF NEW YORK AND VI-
CINITY, et al., Defendants.

EQUAL EMPLOYMENT
OPPORTUNITY COMMISSION,
Plaintiff,

v.

NEWSPAPER AND MAIL DELIVER-
ERS' UNION OF NEW YORK AND VI-
CINITY, et al., Defendants.

Nos. 73 Civ. 3058 (WCC),
73 Civ. 4278 (WCC).

United States District Court,
S.D. New York.

July 8, 1992.

Penda D. Hair, Washington, D.C., Julius L. Chambers, Charles Stephen Ralston, Ronald L. Ellis, Marina C. Hsieh, New York City, for plaintiffs Patterson, et al.

O'Connor & Mangan, P.C., Mineola, N.Y. (J. Kenneth O'Connor, Thomas T. Heney, of counsel), for defendant NMDU.

Equal Employment Opportunity Commission, New York City (James L. Lee, Regional Atty., Anna M. Stathis, Supervisory Trial Atty., Michael J. O'Brien, Trial Atty., of counsel), for E.E.O.C.

Grotta, Glassman & Hoffman, P.A., New York City (Jedd Mendelson, of counsel), for the New York Times.

Stroock & Stroock & Lavan, New York City (David J. Weisenfeld, of counsel), for New York Post.

Proskauer Rose Goetz & Mendelsohn, New York City (Kathleen M. McKenna, of counsel), for defendant Maxwell Newspapers, Inc.

William S. Ellis, New York City Interim Adm'r.

## OPINION AND ORDER

WILLIAM C. CONNER, District Judge.

A class of private plaintiffs and the Equal Employment Opportunity Commission (the "EEOC") brought two civil rights actions in 1973 against the Newspaper and Mail Deliverers' Union of New York and Vicinity (the "NMDU" or "Union") and more than fifty publishers and news distributors having collective bargaining agreements with the Union. Both suits charged that the Union, with the acquiescence of the publishers and distributors, had historically discriminated against minorities, and that the structure of the collective bargaining agreement, combined with nepotism and cronyism, had perpetuated the effects of past discrimination in violation of Title VII of the Civil Rights Act of 1964. Each lawsuit sought an affir-

mative action program designed to achieve for minorities the status they would have had in the newspaper delivery industry but for the alleged discriminatory practices.

On September 19, 1974, then-District Judge Lawrence W. Pierce issued an opinion and order approving a settlement between the parties and incorporating the Settlement Agreement in a Consent Decree, familiarity with which is presumed.[1] *See Patterson v. Newspaper and Mail Deliverers' Union,* 384 F.Supp. 585 (S.D.N.Y. 1974), *aff'd,* 514 F.2d 767 (2d Cir.1975), *cert. denied,* 427 U.S. 911, 96 S.Ct. 3198, 49 L.Ed.2d 1203 (1976).

The Settlement Agreement established a goal of 25% minority employment in the industry within NMDU bargaining units. *See* Settlement Agreement at ¶ 7. That "goal" was defined as "not an inflexible quota but an objective to be achieved by the mobilization of available personnel and resources ... in a good faith effort to maximize employment opportunities for minorities in the bargaining units in the industry represented by NMDU." *See* Settlement Agreement at ¶ 8. To achieve this goal the Settlement Agreement implements an affirmative action program which modifies the hiring procedures for newspaper deliverers under the industry-wide collective bargaining agreement. Under the Consent Decree, each employer maintains a work force of regular situation holders for its minimum delivery needs. To accommodate fluctuations in circulation, the publishers are permitted to supplement their work force with daily shapers.

The daily shapers are divided into three groups with descending hiring priorities. Those shapers on the Group I list have first priority, after the regular situation holders, in order of their shop seniority. The next priority belongs to Group II shapers. Group II consists of all persons holding regular situations or Group I positions with other employers in the industry. Last in order of priority are the Group III shapers.

---

1. The Settlement Agreement is divided into four sections: Equitable Relief (¶¶ 1–2), The Admin- istrator (¶¶ 3–6), Affirmative Action Program (¶¶ 7–27), and General Provisions (¶¶ 28–42).

The Settlement Agreement provides for the orderly flow of Group III shapers into Group I, and from there, into regular situations. The Agreement mandates that for each non-minority Group III member elevated to Group I, a minority Group III member must also be elevated. Moreover, the Agreement requires that for every two non-minority persons added to the Group III list, three minority persons must be added. Through this process, it was intended that the proportion of minority workers in the industry would increase to the 25% goal by June 1979. *See* Settlement Agreement ¶¶ 11, 12, 15. When that goal was not reached by the specified date, the relevant provisions were extended and later extended again.

The Settlement Agreement also established an Administrator, appointed by the Court, to implement the provisions of the Consent Decree and supervise its performance. The Settlement Agreement authorizes the Administrator to hear claims concerning violations of the Decree. Appeals from his decisions are heard in this Court.

## BACKGROUND

On April 17, 1985, the New York Times (the "Times") moved for an order, pursuant to Paragraph 7 of the Final Order and Judgment in this matter dated October 24, 1974, and Rule 60(b), Fed.R.Civ.P., to vacate or modify said Final Order and Judgment on the grounds that (1) the terms of the Final Order and Judgment have been satisfied; and (2) relief therefrom is justified under present circumstances.[2] On February 23, 1987, the Court held a hearing to consider defendants' motion to terminate the Settlement Agreement. At the conclusion of the hearing, the Court ruled from the bench that notwithstanding that some employers had reached or exceeded the 25% figure within their respective operations, the goal to be realized was "25% minority employment in the industry." *See* Hearing Transcript at 125. Accordingly,

this Court deferred its decision on the motion to terminate the Decree until defendants could produce sufficient evidence to demonstrate that minority employment in the bargaining unit had reached 25% throughout the industry as a whole.[3]

On May 30, 1991, having reviewed compliance reports which indicated that the 25% goal had been met and exceeded, this Court restored defendants' motion to vacate the Consent Decree to its calendar. In order to aid it in rendering a decision, the Court directed the Interim Administrator to submit compliance reports of all defendant companies. On September 9, 1991, the Interim Administrator issued a Report in which he concluded that "the minority figure of 28.53% suggests substantial compliance for the industry." Report of the Interim Administrator Concerning the Compliance Reports ("Report") at 9.

On September 30, 1991, the Court issued an Opinion and Order in which it deferred consideration of defendants' motion to vacate the Decree in order that the concerns of the NAACP Legal Defense Fund (the "LDF") respecting the validity of the compliance reports could be addressed. In this regard, the Court indicated that three things would be required or allowed to happen before it again considered the pending motion: (1) each defendant company was to file an affidavit with the Administrator verifying the information contained in the previously filed compliance reports; (2) the LDF and the EEOC could undertake limited discovery concerning the compliance reports "[i]f plaintiffs feel that discovery on compliance continues to be warranted subsequent to such submissions;" and (3) the Administrator was to "conduct an evidentiary hearing following the close of discovery to determine the validity of defendants' compliance reports" "[i]f plaintiffs so request." Opinion and Order, dated Sept. 30, 1991, at 8.

On November 27, 1991, the Administrator provided the Court with a declaration

---

2. On or about April 23, 1985, New York News Inc., the then-publisher of the New York *Daily News,* made a similar motion.

3. By Order dated November 30, 1988, the Court prospectively suspended the 3:2 and 1:1 ratios of the Affirmative Action Program embodied in the Consent Decree.

under the penalty of perjury, in accordance with 28 U.S.C. § 1746, *from each of the* defendant companies, through an authorized agent, to the effect that the compliance reports consisted of and/or were based upon corporate business records.[4] Plaintiffs never availed themselves of the opportunity to conduct discovery of the defendant companies with respect to their compliance reports.[5] On April 2, 1992, Interim Administrator Ellis circulated a letter in which he indicated that the LDF did "not intend to conduct any further investigation concerning the compliance reports." The Interim Administrator's letter makes no reference to any request by the LDF for an evidentiary hearing concerning the validity of the compliance reports. On April 7, 1992, the Court restored the pending motion to modify or vacate the *Patterson* Consent Decree to its calendar for consideration.

This matter is presently before the Court on the motion of defendants Times, Maxwell Newspapers, Inc. ("Maxwell"), New York Post ("Post"), and the NMDU pursuant to paragraph 7 of the Consent Decree [6] and Rule 60(b), Fed.R.Civ.P.,[7] to vacate or modify the Consent Decree. For the reasons discussed below defendants' motion to vacate is granted. The requests of the LDF and the EEOC for continuation of the Consent Decree's substantive provisions, as well as continuation of its existing enforce-ment mechanism or introduction of a new one, are denied.

## DISCUSSION

The principal purpose of the Consent Decree, which defendants entered "without admission by any defendant of a violation of Title VII ... or ... 42 U.S.C. § 1981, and without any finding by this Court that any defendant has discriminated against any person or persons because of race, color or national origin," was "to correct the ... statistical imbalance [of minority individuals]" by "put[ting] minority individuals in the positions they would have occupied had the aforesaid statistical imbalance not existed." The Affirmative Action Program, with its implementation ratios for placement of minorities on Group III and Group I toward the end of attaining the 25% target, was the engine for achieving these purposes.

### Applicable Legal Standard

▮ The Court's jurisdiction to vacate or modify the Consent Decree arises not only from the Consent Decree itself, but from Rule 60(b) of the Federal Rules of Civil Procedure and this Court's inherent equitable power over its decree. In *United States v. Swift & Co.*, 286 U.S. 106, 114, 52 S.Ct. 460, 462, 76 L.Ed. 999 (1932), the Supreme Court held that:

---

4. The statements provided the Court on November 27, 1991 affirm the accuracy of the compliance reports. LDF's argument that no credence can be accorded to what it asserts are "unsworn" statements is unpersuasive. Defendants' statements affirming the accuracy of the compliance reports are declarations subscribed to under the penalty of perjury. By the plain terms of 28 U.S.C. § 1746, such statements are the equivalent of a sworn affidavit, having "like force and effect." Accordingly, in prescribing this verification procedure, the Administrator has established a sufficient basis for the compliance reports to be admitted into evidence and relied upon by the Court.

5. The EEOC assures the Court that it was and is satisfied with the veracity of the compliance reports, and therefore does not object to a judicial determination that the Affirmative Action and Administrator provisions of the Consent Decree should be vacated. *See* EEOC Supp. Memo., dated May 26, 1992, at 1, 8 & n. 3.

6. Paragraph 7 of the Final Order provides that this Court "retains continuing jurisdiction ... for the purpose of enabling any of the parties to apply to the Court for such further orders and directions as may be necessary or appropriate."

7. Rule 60(b) of the Federal Rules of Civil Procedure provides in pertinent part:

   On motion and upon such terms as are just, the court may relieve a party or a party's legal representative from a final judgment, order, or proceeding for the following reasons: ... (5) the judgment has been satisfied, released, or discharged, or a prior judgment upon which it is based has been reversed or otherwise vacated, or it is no longer equitable that the judgment should have prospective application; or (6) any other reason justifying relief from the operation of the judgment.

Power to modify the decree was reserved by its very terms, and so from the beginning went hand in hand with its restraints. If the reservation had been omitted, power there still would be by force of principles inherent in the jurisdiction of the chancery. A continuing decree of injunction directed to events to come is subject always to adaptation as events may shape the need.

■ Before exercising its power to modify or vacate a judicial decree, a court must be convinced by the party seeking relief that the purposes of the litigation as incorporated into the decree have been fully achieved. *See United States v. United Shoe Machinery Corp.*, 391 U.S. 244, 248, 88 S.Ct. 1496, 1499, 20 L.Ed.2d 562 (1968); *see also Rufo v. Inmates of Suffolk County Jail*, —— U.S. ——, 112 S.Ct. 748, 758, 116 L.Ed.2d 867 (1992); *Board of Education of Oklahoma City Public Schools v. Dowell*, —— U.S. ——, 111 S.Ct. 630, 636–37, 112 L.Ed.2d 715 (1991). Second Circuit authority is consistent with the case law cited above, recognizing the necessity for liberal modification of final judgments. *See, e.g., New York State Ass'n for Retarded Children v. Carey*, 706 F.2d 956, 967–70 (2d Cir.), *cert. denied*, 464 U.S. 915, 104 S.Ct. 277, 78 L.Ed.2d 257 (1983) (modification power is "broad and flexible," and is appropriately exercised in light of changing factual circumstances); *Chance v. Board of Examiners*, 561 F.2d 1079, 1086 (2d Cir. 1977) (indicating that vacation of a consent decree is possible when "the purposes of the decree have been achieved.").

■ The EEOC maintains that this case is governed solely by *United States v. Swift & Co.*, 286 U.S. 106, 119, 52 S.Ct. 460, 464, 76 L.Ed. 999 (1932), and that *Dowell* and *Rufo* are inapplicable, so that the permanent injunction portions of the Consent Decree may not be dissolved without a clear showing of grievous harm evoked by new or unforeseen conditions. The Court cannot agree. In *Swift*, the Supreme Court stated:

> The inquiry for us is whether the changes are so important that dangers, once substantial, have become attenuated to a shadow. No doubt the defendants will be better off if the injunction is relaxed, but they are not suffering hardship so extreme and unexpected as to justify us in saying that they are the victims of oppression. Nothing less than a clear showing of grievous wrong evoked by new and unforeseen conditions should lead us to change [the decree.]

286 U.S. at 119, 52 S.Ct. at 464. Since *Swift*, however, the Court has placed less emphasis on the deleterious effects of a decree on the defendant and more on the continuing need for the injunction. In *Rufo*, after examining its "decisions since *Swift*," the Supreme Court specifically remarked "that the 'grievous wrong' language of *Swift* was not intended to take on a talismanic quality, warding off virtually all efforts to modify consent decrees." 112 S.Ct. at 758. The *Rufo* Court cited *United Shoe* for the proposition that *Swift* did not stiffen "the traditional flexible standard for modification of consent decrees." *Rufo*, 112 S.Ct. at 757–58. The Court noted:

> The *Swift* opinion pointedly distinguished the facts of that case from one in which genuine changes required modification of a consent decree, stating that:
>
>> "The distinction is between restraints that give protection to rights fully accrued upon facts so nearly permanent as to be substantially impervious to change, and those that involve the supervision of changing conduct or conditions and are thus provisional and tentative.... The consent is to be read as directed toward events as they then were. It was not an abandonment of the right to exact revision in the future, if revision should become necessary in adaptation to events to be."

112 S.Ct. at 758.

The restraints imposed by the Decree in the instant case, unlike those at issue in *Swift*, were never intended to operate in perpetuity. Indeed, only paragraphs 1 and 2 are declared "permanent." The remaining provisions of the Decree were provisional only—they were to last until the vestiges of racial discrimination in the industry had been removed. As stated in the Consent Decree, the attainment of 25% mi-

nority employment industry-wide was the standard established for measuring compliance with this objective. Since the *Patterson* Consent Decree "involve[s] the supervision of changing conduct or conditions," *see Swift*, 286 U.S. at 114, 52 S.Ct. at 462, the Court concludes that the more rigid standard set forth in *Swift* is inapplicable and that the more flexible standard of demonstrating satisfaction of the Decree's purposes applies to the decision of whether to terminate or modify the Consent Decree.[8]

*Motion to Modify or Vacate the Consent Decree*

The Administrator's statistical compilation of September 17, 1991, which is drawn from the compliance reports, establishes that approximately seven months ago minority representation among regular situation and Group I personnel industry-wide was 27.97%. *See* Letter of Interim Administrator Ellis to the Court, dated Sept. 17, 1991. Subsequent reports show that this level of minority employment has been maintained.[9] As the Court has often noted, minority representation in the membership of NMDU in the newspaper industry in metropolitan New York was less than 1% when the Consent Decree was issued in 1974. The present employment statistics indicate that the pervasive discrimination which caused the near total absence of minority opportunities in 1974 has vanished. The stated objective of the affirmative action program set forth in the Consent Decree—25% minority employment industry-wide—has been achieved. The structure put in place in 1974 to achieve that end is now an unnecessary and expensive relic, and ought to be retired.[10]

The LDF argues that the Consent Decree must continue in effect since it contains no

8. Moreover, as the Supreme Court has noted, the strict standard for modification or vacation of a consent decree announced in *Swift* should not be read out of context: the *Swift* consent decree evolved out of a prolonged antitrust battle between the Government and the meat-packing industry. *See Rufo*, 112 S.Ct. at 757. The Supreme Court, as well as lower federal courts, have distinguished *Swift* from cases arising in an institutional reform setting. Indeed, the Second Circuit has explained that where a decree is the product of institutional reform, an application for the modification of such decree "should ... be viewed with generosity," and modified with "rather a free hand." *New York State Ass'n for Retarded Children*, 706 F.2d at 970–71.

While the institutional reform exception to the standard set forth in *Swift* apparently has only been invoked in cases where the conduct of a governmental facility or operation was being regulated pursuant to the decree, the Court concludes that such cases are analogous to the instant action, suggesting that the same flexible standard regarding vacation or modification ought to apply. Unlike purely commercial consent decrees which involve only the parties to the subsisting litigation, this case, like those in the institutional reform arena—wherein consent decrees were executed, for example, to correct unconstitutional conditions existing in prisons or to remedy the existence of racial segregation in certain of the nation's schools—implicates the public's interest in seeing that persons are not deprived of fundamental rights.

9. The latest revised Quarterly Report of the Administrator, submitted May 26, 1992, indicates that minority representation in the industry represented by the NMDU was 27.78% as of March 30, 1992.

10. The Court agrees with the Times that a foundation is now in place which suggests that minority representation in the industry will continue to increase, notwithstanding vacation of the Consent Decree, because of a "carryover" effect resulting from concentrations of minorities in lower seniority positions on regular situation and Group I lists, coupled with increased voluntary attrition through retirement of more senior, predominantly non-minority NMDU personnel. For example, the Administrator's Report, dated September 9, 1991, demonstrates that while minorities hold only 11 of the first 100 positions on the Times' regular situation list, minority presence increases dramatically thereafter: minorities hold 45 of the positions numbered 100 through 199; 39 of the positions numbered 200 through 299; and 22 of the positions numbered 300 through 367. In addition, roughly 50% of the Times' Group I list is comprised of minorities. The situation at other employers is similar. Accordingly, the posture in which the Consent Decree leaves these lists virtually ensures, via retirements, deaths, buyouts, and attrition, increased minority presence in the industry after the Decree is vacated.

The fact that there are pending or completed proposals by the Times and Imperial Delivery Service, Inc. ("IDS") to purchase the assets of several defendant companies—whereby "28% of the regular situation and Group I positions covered by the Consent Decree will be under new ownership" (Times Supp. Memo., dated May 1, 1992, at 7)—does not prevent the Court from concluding that the parties have shown compliance with the goal of 25% minority representation industry-wide. Indeed, it is likely that the buyouts offered employees in conjunction with these transactions will be exercised by many

expiration date applicable to its substantive provisions. Accordingly, the LDF contends that the parties intended the Consent Decree "to remain in force indefinitely" pending a judicial finding that "every facet" of defendants' operations is free of discrimination. LDF Memo., dated June 27, 1991, at 22. The LDF further submits that such a showing cannot be made at this time and, therefore, that the Consent Decree should remain in force with an Administrator at its helm for another five years.

The parties to the Settlement Agreement could not have intended that the Affirmative Action program and the Administrator provisions would be of infinite duration. Rather, it is clear that those provisions were to remain in place only as long as necessary to effectuate the goal of 25% minority employment in the industry represented by the NMDU. This intent is evidenced by the language of the Settlement Agreement itself. For example, the Settlement Agreement specifically states that:

> Any terms and provisions of any collective bargaining agreements between NMDU and any defendant employer which have been suspended by operation of the Order may be put into effect *when the Order terminates,* unless this Court orders otherwise.

Settlement Agreement at ¶ 33 (emphasis added). Similarly, the Settlement Agreement did not intend that the Administrator's functions would continue indefinitely:

> The Administrator designated by the Court shall remain in office for an initial period of five (5) years after the date of entry of the Order ... and *he or his successor thereafter shall remain in office if and for such time as the Court may direct.*

*Id.* at ¶ 6 (emphasis added).

The affirmative action plan embodied in the *Patterson* Consent Decree, like that approved by the Supreme Court in *United Steelworkers of America v. Weber,* 443 U.S. 193, 209, 99 S.Ct. 2721, 2730, 61 L.Ed.2d 480 (1979), was "not intended to maintain racial balance but simply to eliminate a manifest racial imbalance." To maintain the temporary affirmative action provisions provided for in the Settlement Agreement after they have served their stated purpose would not only be beyond the intent of the parties but would also infringe on the legitimate expectations of non-minority employees. In *E.E.O.C. v. Local 638 ... Local 28 of Sheet Metal Workers' Int'l Ass'n,* 753 F.2d 1172, 1186–87 (2d Cir.1985), *aff'd,* 478 U.S. 421, 106 S.Ct. 3019, 92 L.Ed.2d 344 (1986), the Second Circuit, following the Supreme Court's decision in *United Steelworkers of America v. Weber,* held that "a temporary, race-conscious affirmative action remedy such as a membership goal" lasts "only until the effects of the past discrimination have been eliminated...." The purpose of the Consent Decree in the instant matter has been achieved—the 25% goal agreed to by all parties to the *Patterson* action with the intention of eliminating the effects of past discrimination has been attained. The time has come for this Court to vacate the Consent Decree and allow the industry to self regulate subject, of course, to the laws preventing racial discrimination.[11]

### The LDF's Request for a Hearing

The LDF argues that the Court may not terminate or modify the Consent Decree without a full evidentiary hearing. The LDF requests a hearing so that it may prove: (1) that the industry has committed numerous discriminatory acts and violations of the Settlement Agreement, even during the period while the motions to terminate were pending; (2) that the industry is not capable of self-policing; (3) that ra-

---

more senior employees, thereby accelerating minority movement up the lists.

**11.** Moreover, the Court notes that the parties, in entering into the Consent Decree, could not have intended that defendants should be bound for all eternity to incur the expenses attendant to maintaining the office of the Administrator.

Those expenses have been substantial—for example, the Administrator's fees and expenses for the period January 1975 through March 1985 totalled $573,773. *See* Aff. of Richard J. Jordan, Esq., Director of Labor Relations of the News, at ¶ 11 (annexed to News Memo., dated April 23, 1985).

cial discrimination will escalate if the office of the Administrator is eliminated or other protections afforded by the Settlement Agreement are removed; (4) that an Administrator is desperately needed to protect the rights of minority workers and applicants; (5) that the labor market for jobs within the jurisdiction of the NMDU is now well over 50% minority; and (6) that hiring ratios are still needed in order to prevent massive racial discrimination in hiring. LDF Memo., dated June 27, 1991, at 18–19.

Such a hearing, however, is neither required nor necessary. In the instant case, the Administrator, as well as the Court, has monitored compliance with the Settlement Agreement since its inception. With respect to the instant motion to vacate or terminate the Consent Decree, the parties have presented extensive arguments to this Court in various motion papers, at a conference held on May 30, 1991, and at a hearing held on February 23, 1987. There is, accordingly, a vast evidentiary foundation—both statistical and experiential—which this Court may explore in order to decide whether vacation of the Decree is appropriate.

▆▆▆ Even assuming, *arguendo*, the LDF's proposition that defendants have continued to violate the Consent Decree and that discrimination remains prevalent in the industry, such arguments are not relevant to defendants' application for vacation of the Consent Decree.[12] As this Court has stated previously:

The hearing will not be for the purposes plaintiff has suggested: i.e., to determine whether defendants have violated Title VII of the Civil Rights Act of 1964 or the consent decree. If plaintiffs believe that defendants have violated the consent decree, they should apply to the Administrator for relief pursuant to the decree. If they believe that the decree was insufficient to end discrimination in the industry, they must bring a new action for the relief they seek. This Court cannot grant such relief by modifying the consent decree.

*Patterson v. NMDU,* 42 Empl.Prac.Dec. ¶ 36,722, at 45,281, 1986 WL 14976 (S.D.N.Y. December 15, 1986). The Court granted the LDF an opportunity to request an evidentiary hearing before the Administrator on the only fact relevant to the issue of whether to terminate the Consent Decree—whether the 25% minority employment goal has been achieved. The LDF did not avail itself of that opportunity for over six months and cannot be heard to complain now.

To the extent that the LDF feels that discrimination in the industry continues, despite the attainment of the 25% goal, it is free to bring a new action for the relief it seeks. Indeed, if discrimination is as rampant as the LDF asserts after eighteen years of the Consent Decree, it would be manifest that the Decree has been "insufficient to end discrimination in the industry" and that the LDF should, consistent with

12. Similarly irrelevant is the LDF's argument that 25% minority employment is no longer the appropriate goal given the current relevant labor market. In effect, the LDF asks the Court to ignore the bargained for goal as set forth in the Settlement Agreement—a goal negotiated by the parties and approved by the Court—simply because the goal was not achieved as of June 1, 1979. This the Court will not do. Although the parties set June 1, 1979 as a target date for attainment of the goal, in the event that the goal was not reached by June 1, the Settlement Agreement provides for the reappointment of an Administrator by this Court beyond that period. Surely, had the parties intended the goal to vary depending on the labor market pool in a particular year, they would have drafted an agreement to that effect.

LDF cites *Youngblood v. Dalzell,* 925 F.2d 954 (6th Cir.1991), in which the Sixth Circuit re-

versed the District Court's *sua sponte* termination of a consent decree and ordered the lower court to consider the possibility that the city's racial composition had changed so much since the date the decree was executed that the original hiring goal was obsolete. LDF's reliance on this case is misplaced. The consent decree there specifically directed the defendants to achieve minority representation in the work force consistent with minority representation in the relevant labor market. 925 F.2d at 956. Although a numerical minimum also was stated, the labor market "parity" language in the decree furnished a basis for the conclusion that the minority goal fluctuates with changes in the labor market. No comparable language that would warrant a similar conclusion is present in the *Patterson* Consent Decree.

this Court's ruling, "bring a new action for the relief [it] seek[s]." [13] *Id.* Because new suits may be directed against the NMDU alone or particular employers, enterprises that have achieved substantial minority presence in their work forces and police themselves in other relevant respects need not be entangled in such litigation.

*Plaintiffs' Request that Certain Provisions be Retained*

■ The Times argues that the termination provisions of Paragraph 7, which provide the basis for extinguishing the Affirmative Action program, also apply to the remainder of the Consent Decree. The Times argues, therefore, that the Consent Decree must be vacated in its entirety. Both the EEOC and the LDF argue that each of the sections of the Settlement Agreement is independent and, consequently, paragraphs 15, 17, 20, 21, 28, 29, 30, 33, and 41 should be retained, either in part or in their entirety, irrespective of the disposition of the other parts of the Settlement Agreement. *See* EEOC Memo., dated June 27, 1991, at 15–21; LDF Memo., dated June 27, 1991, at 34–37. Nothing in the Settlement Agreement, however, supports, this type of cut and paste approach. The Settlement Agreement is one cohesive document the goal of which was to increase minority employment in the industry to 25%. The Agreement created the mechanism by which to reach that goal. Again, the parties to the Consent Decree could not have envisioned that jurisdiction here would be retained indefinitely so as to establish, in effect, a permanent system of court supervision of the industry—an ongoing burden of perhaps endless duration that should not be within the Court's ambit.

■ The Court cannot agree with the argument of the EEOC that retention of certain of these provisions is necessary since the purpose of the consent decree extends beyond the goal of 25% minority employment to remedying and preventing nepotism, cronyism and word-of-mouth hiring. EEOC Reply Memo., dated Aug. 19, 1991, at 4–9. The Settlement Agreement was obtained by the EEOC in the enforcement of Title VII with the express purpose of remedying and preventing race discrimination in the industry. Unless there is disparate impact on minority persons, nepotistic practices do not furnish the basis for finding a violation of Title VII. *See, e.g., Scott v. Pacific Maritime Ass'n,* 695 F.2d 1199, 1206–07 (9th Cir.1983) (no violation of Title VII based on racial discrimination where plaintiffs failed to make prima facie showing of disparate impact in operation of union's permissive rule, providing that the son or daughter of a deceased longshoreman or clerk is to be granted Class B registration if he or she is the sole support of the deceased's widow and over the age of 18 years). Because minorities are not now underrepresented in the industry, nepotistic practices could, if they existed, advantage minority persons as much as nonminorities. The objective of the Consent Decree was the elimination of minority underrepresentation in the industry, and no more. Since the 25% goal has been attained, the Decree has served its purpose, and its vacation, consistent with the intent which accompanied its entry, is appropriate.

■ Nor is the retention of paragraphs 1 and 2 of the Settlement Agreement justified. Those paragraphs parallel federal law and prohibit discrimination against individuals on the basis of race, color, or national origin. While it is true that paragraphs 1 and 2 purport to enjoin defendants "permanently," the enforceability of these provisions is qualified. Both begin with the phrase "[s]ubject to the provisions herein." Accordingly, defendants are per-

---

**13.** Title VII channels are open to any potential complainants. In addition, since 1987 the NMDU labor contracts have routinely included an anti-discrimination clause. As a result, minority employees throughout the industry can assert and pursue grievances arising from their employers' or the Union's asserted discriminatory conduct through the NMDU labor contract's grievance procedure. Failure on the part of the Union to properly represent a grievant in such matters would permit the grievant to file charges with the National Labor Relations Board. Thus, an aggrieved employee also has the grievance and arbitration mechanism of the Collective Bargaining Agreement in the event a claim of discrimination arises.

manently enjoined from committing discriminatory acts "subject to" the other provisions of the Consent Decree. The only intelligible construction of this "subject to" language is that the non-discrimination provisions are binding upon defendants as long as the Consent Decree remains in effect—in other words, until the Court determines that the Consent Decree is no longer needed. In any event, paragraphs 1 and 2 do no more than prohibit conduct that is already prohibited by Title VII. Given this redundancy, there is no point in continuing those provisions after the remainder of the Consent Decree has been terminated.[14]

■ The fact that paragraphs 1 and 2 are designated "permanent" is not a proscription against their termination. As the Supreme Court noted in *Milk Wagon Drivers Union, Local 753 v. Meadowmoor Dairies, Inc.,* 312 U.S. 287, 298, 61 S.Ct. 552, 557, 85 L.Ed. 836 (1941):

> The Injunction which we sustain is "permanent" only for the temporary period for which it may last. It is justified only by the [the circumstances] that induced it and only so long as it counteracts [those circumstances]. Familiar equity procedure assures opportunity for modifying or vacating an injunction when its continuance is no longer warranted.

Thus, the term "permanent" does not mean irrevocable in perpetuity, and the court has the power to vacate injunctive relief that nominally is "permanent."

Indeed, courts have indicated that permanent injunctive relief should be vacated when it requires nothing more than compliance with the law that was the source of its issuance. In *S.E.C. v. Warren,* 583 F.2d 115 (3d Cir.1978), the Third Circuit ruled that the district court did not abuse it discretion in dissolving a permanent injunction which contained a restraint from future violations of the Securities Exchange Act. The court noted that:

> In effect the injunction merely requires defendants to 'obey the law in the future ...' a requirement with which they must comply regardless of the injunction. Dissolution of the injunction decree removes the possibility of contempt proceedings in the event of a future violation; the right to prosecute ... civilly still exists.

583 F.2d at 121. *See also Payne v. Travenol Laboratories, Inc.,* 565 F.2d 895, 898 (5th Cir.), *cert. denied,* 439 U.S. 835, 99 S.Ct. 118, 58 L.Ed.2d 131 (1978) ("[t]he word 'discriminating' ... is too general. The provision is more specific than Title VII itself only in that it does not prohibit employment discrimination based on religion and natural origin ... Such 'obey the law' injunctions cannot be sustained").[15]

The terms and spirit of the Settlement Agreement, as well as the law of the case, dictate that the Consent Decree be extinguished upon attainment of the 25% target. That target having been attained, this Court hereby orders that the Consent Decree be vacated in its entirety. After eighteen years of Court and Administrator supervision, the goal has been achieved. Both equity and judicial economy dictate that the EEOC resume its role as the initial forum for review of allegations of discrimination under Title VII. As the Court of Appeals for the Sixth Circuit stated in *Youngblood v. Dalzell,* 925 F.2d 954 (6th Cir.1991):

> The concerns originally voiced in the decree may yet remain.... Yet our interest in seeing that the decree is not dissolved prematurely is coupled with a re-

---

**14.** The EEOC is mistaken in its contention that at a conference held on May 30, 1991, this Court indicated that it would not dissolve paragraphs 1 and 2 of the Consent Decree. The Court did not so rule; rather, it referred to the effective continuation of these provisions by the laws against discrimination.

**15.** The rationale for this principle is that an "obey the law" injunction is too vague to enforce under the standards of Rule 65, Fed.R.Civ. P., since contempt is a possible remedy for its violation. The Court of Appeals for the Second Circuit has acknowledged that Rule 65(d) "reflects Congress' concerns with the dangers inherent in the threat of a contempt citation for violation of an order so vague that an enjoined party may unwittingly and unintentionally transcend its bounds." *Sanders v. Air Line Pilots Ass'n, Int'l,* 473 F.2d 244, 247 (2d Cir.1972) (citing *Int'l Longshoremen's Ass'n, Local 1291 v. Philadelphia Marine Trade Ass'n,* 389 U.S. 64, 76, 88 S.Ct. 201, 208, 19 L.Ed.2d 236 (1967)).

alization that not every wrong in the Cincinnati fire department can be righted by a decree which is now 17 years old, and the district court may find that other ... litigation offers a better vehicle for addressing any alleged legal wrongs in the City's policies today once those initial goals have been achieved.

925 F.2d at 961–62 (footnote omitted). Like the court in *Youngblood*, this Court recognizes that the current Consent Decree "may not offer the best solution to any ongoing concerns that today's victims of discrimination may voice."[16]  *Id.* at 961.

It must be emphasized that the termination of the Consent Decree does not alter defendants' substantive legal obligation to obey the law.  Nor does vacating the Consent Decree permit defendants to discriminate against minorities in employment decisions.  Title VII and other similar laws remain in effect and are fully applicable to defendants.  As in all other sectors of the economy, aggrieved individuals will be able to take any complaints they may have to the EEOC, and ultimately to the courts if appropriate, for processing.

## CONCLUSION

The Consent Decree is hereby vacated in its entirety.  In order to affect an orderly winding down of the Administrator's office he is instructed to hear and decide all claims that have been instituted prior to the date of this Order.  Until such cases are disposed of the Administrator's services shall be continued, but for the sole purpose of completing said cases.  This Court shall retain jurisdiction over any appeals

from those claims.  No new claims shall be initiated or processed.

SO ORDERED.

16. The LDF's Offer of Proof, dated August 19, 1991, contains the declarations of 29 minority regular situation holders at the defendants Long Island News Co., Metropolitan News Co., the News, the Post, the Times, Newark Newsdealers Supply, Passaic County News, Westfair News, and Imperial News Co.  These individuals make allegations of intentional discrimination in connection with assignment of work, discipline, compensation, selection of foremen, adjustment of routes following route consolidation, bidding, and tractor-trailer certification.  Such assertions are not properly raised at this time.  In

December 1986, this Court instructed the LDF to prosecute alleged violations of the Consent Decree before the Administrator.  Such matters are not to be raised for the first time in this proceeding.  *See Patterson v. NMDU*, 42 Empl. Prac.Dec. ¶ 36,722, at 45,281, 1986 WL 14976 (S.D.N.Y. Dec. 15, 1986).  Assuming, *arguendo*, that the declarants' accusations are true, this Court reiterates that "not every wrong ... can be righted by a decree which is now [18] years old."  925 F.2d at 961.  Other litigation may today offer a better vehicle for addressing any alleged legal wrongs.