UNITED STATES of America,
Plaintiff–Appellee,

Sanitation Employees Association, Inc.,
a non-profit Fla. Corporation,
Plaintiffs–Intervenors,

v.

The CITY OF MIAMI, et al.,
Defendants–Appellees,

Fire Fighters Local AFL–CIO,
Defendant–Intervenor–
Appellant.

No. 90–5107.

United States Court of Appeals,
Eleventh Circuit.

Sept. 17, 1993.

Robert D. Klausner, Hollywood, FL, for defendant-intervenor-appellant.

Richard T. Seymour (amicus), James C. Gray, Jr., Washington, DC, for amicus curiae.

Marilyn J. Holifield, Miami, FL, for amicus curiae.

Charles Chester Mays, Kathryn S. Pecko, Asst. City Atty., Albertine T. Smith, Asst. City Atty., Miriam R. Eisenstein, Dept. of Justice, Washington, DC, for plaintiff-appellee.

Before DUBINA, Circuit Judge, HENDERSON and CLARK, Senior Circuit Judges.

CLARK, Senior Circuit Judge.

More than 15 years ago the City of Miami entered into a consent decree that had as its purpose the elimination of the effects of past sex, race and ethnic discriminatory employment practices. The decree enjoined the City and all of its agents and employees from discriminating against any City employee or potential employee on the basis of race, color, sex or national origin. The Miami Association of Firefighters, Local 587, International Association of Firefighters, AFL–CIO ("Local 587"), the appellant in this appeal, consented to the terms of this decree. Now, however, Local 587 contends that the consent decree has served its purpose in the City of Miami Fire Department and should be terminated or, alternatively, modified as to the Fire Department. The question on appeal is whether the district court correctly determined that there was no "evidentiary or legal basis" for either dissolution or modification of the consent decree.

We conclude the district court should revisit its conclusion that "Similarly, the Union has not demonstrated that the minority promotional goals are not temporary measures designed to eliminate a manifest racial imbalance"[1] and its conclusion that:

> The participation of Blacks, Hispanics, and women in the promotional ranks at the Fire Department does not approximate parity with their "respective proportions in the City's labor force." Consent Decree at par. 5. The substantial underrepresentation of these groups in the promotional ranks demonstrates that the "basic objectives" of the Consent Decree have not been achieved. Consent Decree at par. 13.[2]

We acknowledge that this case involves only the issue of promotions within the Fire Department. Nevertheless, we conclude that the basic hiring goals required to be met by the decree must necessarily impact upon promotions in later years.

Because the district court made its determination without the benefit of recent Supreme Court cases that articulate legal principles that we hold applicable to requests to terminate or modify consent decrees in cases such as this, we find it necessary to vacate the district court's decision. Without finding that the district court erred in any specific ruling in the order on appeal, we nevertheless remand the case for reconsideration of its ruling in light of these recent cases. Changes in the law governing the termination of consent decrees in general, and

---

1. District court op. at 17.

2. District court op. at 14.

discrimination cases in particular, should be considered. Additionally, as we read the consent decree at issue here, we conclude that some of its requirements may never be possible to achieve because of the recurrence of demographic changes. In other words, some of the goals in the decree provide a moving target. We shall explicate our concerns.

## I. HISTORY OF THIS LITIGATION

This litigation began in 1975 when the United States Attorney General filed a complaint against the City of Miami, various of its officials, and several organizations of police officers alleging violations of Title VII of the Civil Rights Act of 1964, the Fourteenth Amendment to the Constitution of the United States, and 42 U.S.C. sections 1981 and 1983. Specifically, the Attorney General alleged that the defendants were engaged in policies and practices that discriminated against black, Spanish-surnamed, and female individuals with respect to employment opportunities and conditions of employment within the City of Miami. The United States and the City of Miami eventually entered into the consent decree that is the subject of this appeal. On March 31, 1977, the district court accepted the consent decree and entered it as the judgment of the court. The consent decree provides, in pertinent part:

1. The defendant City of Miami, its officials, agents, employees, and all persons in active concert or participation with them in the performance of City functions (hereinafter collectively referred to as the City) are permanently enjoined and restrained from engaging in any act or practice which has the purpose or effect of unlawfully discriminating against any employee of, or any applicant or potential applicant for employment with, the City of Miami because of such individual's race, color, sex or national origin. Specifically, the City shall not fail or refuse to hire, promote, upgrade, train or assign any individual, discharge any individual or otherwise discriminate against any individual as an employee or applicant for employment with respect to compensation, terms, con-

ditions or privileges of employment because of race, color, sex or national origin.

In no event shall the City be required to hire unnecessary personnel, to hire, transfer or promote a person who is not qualified, or to hire, transfer or promote a less qualified person, in preference to a better qualified person, consistent with the provisions of this decree.

* * * * *

5. *Goals*

In order to eliminate the effects of past discriminatory practices against blacks, Latins and women, the City shall adopt and seek to achieve as its long term goal the participation at all levels throughout its work force of blacks, Latins and women approximating their respective proportions in the City's labor force, as determined by the United States Bureau of the Census. The purpose of this goal is to eliminate the substantial underrepresentation and uneven distribution of blacks, Latins and women throughout the City's work force.

(a) *Hiring*

In order to achieve this long term goal, subject to the availability of qualified applicants, the following recruitment and hiring goals shall be established for blacks, Latins and women (blacks and Latins are referred to collectively in this paragraph 5 as minorities). It is understood that the goals are minimums, and that the City shall seek to fulfill the goals by hiring blacks, Latins and women generally in proportion to their representation in the labor force. Only full time regular civil service employees who have successfully completed their probationary period, or, in the case of the Police and Fire Departments, those who successfully complete the police academy or fire college, shall be counted in determining progress toward the goals. Progress toward these goals shall be measured on an annual basis.

(1) For each entry level position of police officer, public service aide, fire fighter and traditionally white Anglo male positions in the Departments of Finance and Building, the goal shall be 56% minorities and women each year. For purposes of this subparagraph, traditionally white An-

glo male positions shall include such positions as building inspector, zoning inspector and skilled trades.

. . . . .

(b) *Promotion*

Subject to the availability of qualified applicants, promotional goals shall be established for minorities, on a department basis, with each department having as its yearly goal, until the long term goal has been met for a period of one year, either parity with the Miami City workforce population statistics or the percentage of minorities currently employed in the department, whichever is smaller. Priority opportunity for promotion (as defined in paragraph 7(b) below) within a particular department shall be provided to qualified persons who have indicated a desire or interest in the promotion, transfer and assignment opportunities created by this decree. Each person responding to this request shall be promoted or transferred pursuant to the provisions of paragraph 7 below.

. . . . .

7. *Promotion and/or Transfer Pool*

. . . . .

(b) A member of the affected class shall be given the initial opportunity to fill any vacancy in the City where the person is the senior applicant who meets, or could reasonably be expected to meet after an initial probationary period, the minimum qualifications for the position unless an applicant not a member of the affected class has demonstrably superior qualifications. This preference shall be exercised at the written election of the applicant. An affected class member using this preference who successfully completes the probationary period shall at that time be informed that s/he can remain in that position or return to his/her prior position.

(c) If no affected class member seeks or is entitled to a vacancy as provided in (b) above, the vacancy shall be filled pursuant to the procedures and goals for hiring set forth in this decree.

. . . . .

(f) Rights of a member of the affected class under paragraph 7 are limited to (1) one successful promotion or transfer, or (2) three unsuccessful attempts to promote or transfer.

. . . . .

13. *Jurisdiction*

The Court retains jurisdiction of this action for such further orders as may be appropriate. At any time after five years subsequent to the date of the entry of this Consent Order, the City may move the Court upon 45 days notice to the plaintiff for dissolution of this decree, and in considering whether the decree should be dissolved, the Court will take into account whether the City has substantially complied with this decree and whether the basic objectives of the decree have been achieved.[3]

Although the consent decree contains no explicit finding of past discrimination, the City of Miami conceded early in the course of litigation that certain statements in the de-

---

**3.** The consent decree is reprinted in full as an appendix to the panel opinion, *United States v. City of Miami, Florida,* 614 F.2d 1322, 1342 (5th Cir.1980), *on rehearing,* 664 F.2d 435 (5th Cir. 1981) (*en banc*).

The decree was entered over the objections of the unions that represented the Miami Police Officers, and the unions appealed. The former Fifth Circuit, sitting *en banc,* was unable to arrive at a majority consensus. *United States v. City of Miami, Florida,* 664 F.2d 435 (5th Cir. 1981) (*en banc*). The mandate that the Fifth Circuit issued modified the decree to provide that it did not affect the promotion of members of the Police Department and remanded the case for the district court to determine whether the United States had a right to claim any relief concerning police promotion. *Id.* at 448. The court did not review and thus left in force those portions of the decree that did not affect members of the police unions. *See id.* at 445. On remand, the police unions consented to re-entry of the consent decree, with some modifications to those provisions pertaining to promotions in the Police Department. Because this appeal involves the Fire Department, not the Police Department, we recite the history of this litigation as it pertains to the Police Department only to the extent necessary to an understanding of this appeal.

cree constitute "a tacit admission of past discrimination." [4]

In July 1978, Local 587, the appellant in this appeal, consented to the terms of the consent decree, and the district court subsequently permitted Local 587 to intervene in this litigation. Thereafter, Local 587 entered into a new collective bargaining agreement with the City; the prevailing benefits provision of this new contract provided that "nothing in this [provision] shall prevent the City from implementing the terms of the Consent Decree."

After Local 587 signed the consent decree, the City Commission of the City of Miami implemented its own affirmative action programs. In July 1979, the Commission adopted Ordinance 8977, which, among other things, sets out the procedure for the appointment, promotion, and advancement of City employees. The ordinance provides that vacancies are to be filled from a list of eight individuals, consisting of the five highest ranking persons on the eligible register and the three highest ranking minorities from that register. This provision is often referred to as the "Rule of Eight." The City Commission also established a policy requiring that 80% of all persons hired into the Fire Department be black, Hispanic, or female; thus, the City placed upon itself the burden of hiring 80% minorities and women,

rather than the 56% goal of the consent decree.

Local 587 challenged the City's implementation of the Rule of Eight. Local 587 requested that the district court enjoin implementation of this Rule, claiming that such implementation would violate the consent decree, the collective bargaining agreement between Local 587 and the City, and the equal protection provisions of the United States Constitution. By order dated June 1, 1983, the district court denied Local 587's request. The court held that Local 587 had signed the consent decree and, therefore, was bound by its terms and that the Rule of Eight did not violate the consent decree and, in fact, was an appropriate tool to rectify the effects of past discrimination. Local 587 appealed the district court's order, but the appeal was dismissed on procedural grounds. Since its enactment, the City has adhered to the Rule of Eight in making appointments, promotions, and advancements in the Fire Department.

The City's hiring policies resulted in a dramatic improvement in the employment of minorities and women in the Fire Department. The chart below shows the percentage of each of the named groups in the Fire Department in 1977 and in 1989, as well as to labor force availability of each group:

| | 1977 | 1989 | Labor Force Availability |
|---|---|---|---|
| Anglos | 91.0% | 59.4% | 19.1% |
| Blacks | 1.5% | 11.6% | 21.4% |
| Hispanics | 7.5% | 28.7% | 59.5% |
| Women | 0.0% | 4.0% | 45.9% |

---

The City's promotion policies also resulted in an improvement in the advancement of minorities within the Fire Department. As of August 1, 1989, the ethnic and gender breakdown of the Fire Department according to rank was as follows:

| Job Category | Males | | | Females | | |
|---|---|---|---|---|---|---|
| | A | B | H | A | B | H |
| Fire Chief | 1 100% | | | | | |
| Deputy Chief | 1 50% | 1 50% | | | | |

**4.** 664 F.2d at 443.

| Job Category | Males | | | Females | | |
|---|---|---|---|---|---|---|
| | A | B | H | A | B | H |
| Division Chief | 5<br>63% | 1<br>12% | 2<br>25% | | | |
| Chief Fire Officer | 12<br>100% | | | | | |
| Fire Captain | 38<br>79% | | 10<br>21% | | | |
| Fire Lieutenant | 74<br>71% | 10<br>10% | 20<br>19% | 1<br>0% | | |
| Fire Fighter | 238<br>50% | 63<br>13% | 151<br>32% | 19 | 1<br>25 women–5% | 5 |

In January 1989, Local 587 filed a motion to dissolve the consent decree or, in the alternative, to modify the decree. It is this motion that is the subject of this appeal. Local 587 did not challenge the validity of the consent decree as originally implemented; rather, it alleged that the decree had served its purpose:

> The continued implementation of the Consent Decree in its current form is no longer directed at correcting actual discrimination or the effects of actual discrimination. Rather, the City has institutionalized a quota system that unduly infringes the interest of employees not benefiting from the plan.
>
> . . . . .
>
> Rather, the practices of the City since the entry of the Consent Decree twelve years ago and the changing composition of the City's work force as a result of a vigorous hiring program of minorities has transformed the Consent Decree from a tool to eliminate the vestiges of prior discrimination into the institutionalized form of hiring and promotion based solely on race.[5]

Local 587 requested that the district court vacate the consent decree or, in the alternative, modify the decree so that "promotional goals are based upon the number of qualified applicants within the City of Miami Fire Department as opposed to some general workforce statistics within the general population."[6]

The City and the United States both opposed Local 587's motion, arguing that dissolution of the decree was inappropriate because the City had not achieved the long term goal of work force parity as stated in the decree; specifically, the Fire Department did not have "participation at all levels throughout its work force of blacks, Latins and women approximating their respective proportions in the City's labor force...."[7]

After a hearing, the district court entered an order denying Local 587's motion. The district court first concluded that, because Local 587 does not engage in collective bargaining with the City over hiring in the Fire Department, the scope of the motion was limited to promotions within the ranks of Fire Lieutenant, Fire Captain, and Chief Fire Officer in the Fire Department.[8] The

---

5. Motion to Dissolve Consent Decree (R7–395) ¶¶ 18 and 25.

6. *Id.* at ¶ 32.

7. Consent Decree at paragraph 5.

8. Local 587 does not challenge the district court's ruling as to the scope of its motion. Thus, the district court's ruling, and our review of that ruling, is limited to the promotion provisions of the decree that affect Local 587's members. *See United States v. City of Miami, Florida,*

664 F.2d at 445 (*en banc* plurality decision) (Union representing members of the police department "cannot challenge provisions of the decree that affect only the City and municipal employees outside the police department or applicants for positions in the police department who, while affected by the hiring goals in the decree, are not members of the [union]. [Footnote omitted.]"). While this limited scope restricts the district court's authority to modify provisions other than those that affect Local 587's members, we do not think that it restricts that court's authority to

district court then stated that the consent decree could not be terminated until the City had achieved the "basic objectives of the Decree." Relying on paragraph five of the decree, the court concluded that the basic objectives of the decree had not been achieved because "participation of Blacks, Hispanics, and women in the promotional ranks at the Fire Department does not approximate parity with their 'respective proportions in the City's labor force.'" The district court declined to either dissolve the decree or to modify its provisions, holding that Local 587 had not presented "an evidentiary or legal basis" for such action. Local 587 appealed.

## II. DISCUSSION

We first address what standard is applicable to requests for modification or termination of consent decrees in employment discrimination class actions. Holding that a flexible standard is applicable, we next ask whether a district court can *sua sponte* decide whether a consent decree of the type at issue here should be reviewed periodically to determine whether it should be terminated. Holding that a court can make such an inquiry, we discuss the nature of the inquiry that the district court should make in this case.

A. Standard for modification or termination of consent decrees in employment discrimination class actions

Historically, courts have looked to *United States v. Swift & Co.*[9] as the seminal case on the propriety of changing a standing consent decree. In *Swift*, a Sherman Act anti-trust case brought by the United States, five meat packing companies in 1920 entered into a consent decree with the government that enjoined their monopolistic practices. In 1930 these companies sought a modification of the decree, which was granted in part by the district court. The Supreme Court reversed.

Since then courts have applied what has become known as the *Swift* "grievous wrong" standard:

> Nothing less than a clear showing of grievous wrong evoked by new and unforeseen conditions should lead us to change what was decreed after years of litigation with the consent of all concerned.[10]

Recently, however, the Supreme Court has articulated more flexible standards to be applied to consent decrees which were entered for the purpose of amicably redressing statutory and constitutional wrongs committed against individuals by public institutions.

*Rufo v. Inmates of Suffolk County Jail*[11] began as a lawsuit by inmates who sought to correct unconstitutional conditions at the Suffolk County Jail. Eventually, the parties agreed to, and the district court entered, a consent decree, pursuant to which the defendants expressed their desire to provide, maintain and operate "'a suitable and constitutional jail.'"[12] The decree specifically incorporated the provisions of an architectural program that called for a new jail with a specified number of "'[s]ingle occupancy rooms.'"[13] Several years later, while the new jail was still under construction, the defendants moved to modify the decree to allow some double bunking of prisoners; the defendants argued, among other things, that the dramatic increase in the prisoner population justified modification. Citing the *Swift* "grievous wrong" standard, the district court denied the motion to modify, reasoning that the single cell requirement had been an "important element" of the relief sought in the litigation. The court of appeals affirmed the district court's decision.

The Supreme Court vacated the decision of the court of appeals, holding that the district court had applied the wrong standard in denying the defendants' motion. The Court distinguished between consent decrees "'that

---

terminate the entirety of the decree as it applies to the Fire Department if Local 587 demonstrates that termination is appropriate under the principles set forth in this opinion.

9. 286 U.S. 106, 52 S.Ct. 460, 76 L.Ed. 999 (1932).

10. *Id.* at 119, 52 S.Ct. at 464.

11. —— U.S. ——, 112 S.Ct. 748, 116 L.Ed.2d 867 (1992).

12. —— U.S. at ——, 112 S.Ct. at 755.

13. *Id.*

give protection to rights fully accrued upon facts so nearly permanent as to be substantially impervious to change'" and those "'that involve the supervision of changing conduct or conditions and are thus provisional and tentative.'"[14] The Court held that, in cases involving the latter class of decrees, the standard for modification should be flexible: "Because [consent decrees in institutional reform litigation] often remain in place for extended periods of time, the likelihood of significant changes occurring during the life of the decree is increased."[15] The Court then articulated the following flexible standard to be applied to consent decrees in institutional reform litigation:

> [A] party seeking modification of a consent decree must establish that a significant change in facts or law warrants revision of the decree and that the proposed modification is suitably tailored to the changed circumstance.[16]

Applying this flexible standard to the facts of the case before it, the Court concluded that the district court had erred in determining that the single cell requirement was an "important element" of the relief sought in the litigation and that modification of this requirement was, therefore, inappropriate. The Court explained:

> Even if the decree is construed as an undertaking by petitioners to provide single cells for pretrial detainees, to relieve petitioners from that promise based on changed conditions does not necessarily violate the basic purpose of the decree. That purpose was to provide a remedy for what had been found, based on a variety of factors, including double celling, to be unconstitutional conditions obtaining in the [Suffolk County Jail]. If modification of one term of a consent decree defeats the purpose of the decree, obviously modifica-

tion would be all but impossible. That cannot be the rule. The District Court was thus in error in holding that even under a more flexible standard than its version of *Swift* required, modification of the single cell requirement was necessarily forbidden.[17]

Thus, the Court determined that while modification would not be appropriate if it would "violate the basic purpose of the decree," the modification of the single cell requirement did not violate the basic purpose of the decree at issue and, therefore, was not necessarily forbidden.

■ We do not read the Supreme Court's explanation of the interplay between the basic purpose of a decree and a requested decree modification as a broad holding that the change of a single decree term can never defeat the decree's basic purpose. Rather, we read the Supreme Court as rejecting a broad rule that modification of a single decree term necessarily defeats the decree's purpose.[18] As Justice O'Connor said in her concurrence:

> It may be that the modification of one term of the decree does not *always* defeat the purpose of the decree. [Citation omitted.] But it hardly follows that the modification of a single term can *never* defeat the decree's purpose, especially if the term is "the most important element" of the decree.[19]

Thus, a court faced with a motion to modify a consent decree in institutional reform litigation must begin by determining the "basic purpose" of the decree. If the decree term that is the subject of the requested modification is central to the decree, or, as Justice O'Connor put it, "the most important element" of the decree, then the modification is likely to violate the basic purpose of the

---

**14.** —— U.S. at ——, 112 S.Ct. at 758 (quoting *Swift*, 286 U.S. at 114–115, 52 S.Ct. at 462).

**15.** —— U.S. at ——, 112 S.Ct. at 758.

**16.** *Id.* at ——, 112 S.Ct. at 765.

**17.** *Id.* at ——, 112 S.Ct. at 762.

**18.** *See* Kevin E. Hooks, *Rufo v. Inmates of Suffolk County Jail: Modification of Consent Decrees in*

*Institutional Reform Litigation*, 26 Ga.L.Rev. 1025, 1029 (1992) ("Determining that the district court erred in holding that modification of the single cell requirement was forbidden even under the flexible standard, the majority explicitly rejected the district court's rule that modification of one decree term defeats the decree's purpose. [Footnote omitted.]").

**19.** —— U.S. at ——, 112 S.Ct. at 767 (O'Connor, J., concurring).

decree and, therefore, will be forbidden. If, on the other hand, the decree term at issue merely sets out one of several means of accomplishing the purpose of the decree or one of several means of measuring compliance with the decree's objective, then the requested modification is not necessarily prohibited.[20]

A court faced with a motion to terminate, as opposed to merely to modify, a consent decree must begin by determining the basic purpose of the decree. We find instructive the Supreme Court's recent decisions as to the propriety of the termination of decrees in the school desegregation cases. In *Board of Education of Oklahoma City Public Schools v. Dowell,*[21] a case in which the district court had dissolved a desegregation decree, the Supreme Court, as it did in *Rufo,* rejected as erroneous the application of the *Swift* "grievous wrong" standard. Noting that a decree may not be changed " 'if the purposes of the litigation as incorporated in the decree ... have not been fully achieved,' "[22] the Court stated:

> In the present case, a finding by the District Court that the Oklahoma City School District was being operated in compliance with the commands of the Equal Protection Clause of the Fourteenth Amendment,

and that it was unlikely that the school board would return to its former ways, would be a finding that the purposes of the desegregation litigation had been fully achieved. No additional showing of "grievous wrong evoked by new and unforeseen conditions" is required of the school board.[23]

The Supreme Court then went on to emphasize the importance of a school board's good faith compliance with a decree requiring desegregation when a court is determining whether the decree should be terminated.[24] Summarizing, the Court said:

> The District Court should address itself to whether the Board had complied in good faith with the desegregation decree since it was entered, and whether the vestiges of past discrimination had been eliminated to the extent practicable.[25]

■ We find that the principles articulated in *Rufo* and *Dowell* are applicable to requests to modify or terminate decrees in employment discrimination class actions, like the one before us.[26] Generally, the remedies in employment discrimination consent decrees are intended to eliminate present and future discrimination in employment and sometimes to redress the imbalance caused by past discrimination.[27] The decrees fall

20. *See* Hooks, 26 Ga.L.Rev. at 1047 ("In applying the *Rufo* modification standard, the court will be guided by the underlying purpose of the original decree. Any modification requests by succeeding state officials must comport with the original purpose, and therefore the institutional undertakings by the preceding officials will not be nullified.... At most, the only nullification that could possibly occur through modification under the flexible standard is in the *means* employed to achieve the original purpose of the decree. The flexible standard allows for alteration of these means if new circumstances warrant the change, circumstances that often occur in the institutional reform area.").

21. 498 U.S. 237, 111 S.Ct. 630, 112 L.Ed.2d 715 (1991).

22. 498 U.S. at 247, 111 S.Ct. at 636 (quoting *United States v. United Shoe Machinery Corp.,* 391 U.S. 244, 248, 88 S.Ct. 1496, 1499, 20 L.Ed.2d 562 (1968)).

23. 498 U.S. at 247, 111 S.Ct. at 636–37.

24. *Id.* at 249, 111 S.Ct. at 637–38; *see also Freeman v. Pitts,* —— U.S. ——, ——, 112 S.Ct.

1430, 1446, 118 L.Ed.2d 108 (1992) (in determining whether withdrawal of its supervision in school desegregation case is appropriate, district court "should give particular attention to the school system's record of compliance").

25. 498 U.S. at 249–50, 111 S.Ct. at 638 (footnote omitted).

26. *See Patterson v. Newspaper and Mail Deliverers' Union of New York and Vicinity,* 797 F.Supp. 1174, 1180 (S.D.N.Y.1992) (employment discrimination class action in which court concluded "that the more rigid standard set forth in *Swift* is inapplicable and that the more flexible standard of demonstrating satisfaction of the Decree's purposes applies to the decision of whether to terminate or modify the Consent Decree. [Footnote omitted.]").

27. *See United Steelworkers of America, AFL–CIO–CLC v. Weber,* 443 U.S. 193, 208, 99 S.Ct. 2721, 2730, 61 L.Ed.2d 480 (1979) (approving an affirmative action plan because, among other things, "the plan is a temporary measure; it is not intended to maintain racial balance, but simply to eliminate a manifest racial imbalance"); *Pat-*

squarely within that class of decrees that "'involve the supervision of changing conduct or conditions and are thus provisional and tentative.'"[28] These decrees are *not* intended to maintain employment quotas; their only purpose is to remedy the effects of past discrimination.[29] Since the impact of these decrees reaches beyond the initial beneficiaries of the lawsuit, the decrees may have a significant impact upon third parties, such as non-favored groups.[30] Accordingly, we hold that the principles applicable to requests to modify or terminate consent decrees in the institutional reform arenas of prisons and schools are also applicable to such requests in employment discrimination class actions.

### B. District court's authority to consider *sua sponte* termination of the decree

■ When the remedy prescribed in the consent decree has been accomplished, a district court does not have to await a party's motion to terminate a decree which requires temporary supervisory jurisdiction of an agreed upon consent decree. In *Swift*, the Court stated:

> The result is all one whether the decree has been entered after litigation or by consent. In either event, a court does not abdicate its power to revoke or modify its mandate, if satisfied that what it has been doing has been turned through changing circumstances into an instrument of wrong.[31]

The First Circuit in *In re Pearson*,[32] has spoken on this subject:

> In institutional reform litigation, injunctions should not operate inviolate in perpetuity. This must mean that, notwithstanding the parties' silence or inertia, the district court is not doomed to some Sisyphean fate, bound forever to enforce and interpret a preexisting decree without occasionally pausing to question whether changing circumstances have rendered the decree unnecessary, outmoded, or even harmful to the public interest.

> \* \* \* \* \* \*

> After two decades of intimate involvement with an especially complex public institution immersed in a state of continuing transition, the district court is still mired in litigation. We think that this scenario at least arguably reflects an exceptional condition. Hence, appointing a master to survey the legislative landscape, investigate the incidence and impact of changed circumstances, assess the current relevance of the decrees, and report the results to the court did not constitute palpable error as a matter of law.

Accordingly, the district court in this case is authorized to consider *sua sponte* whether termination of the consent decree is appropriate.

---

**28.** *Rufo*, —— U.S. at ——, 112 S.Ct. at 758 (quoting *Swift*, 286 U.S. at 114–15, 52 S.Ct. at 462).

**29.** *See Local 28 of Sheet Metal Workers' International Association v. Equal Employment Opportunity Commission*, 478 U.S. 421, 477–78, 106 S.Ct. 3019, 3051, 92 L.Ed.2d 344 (1986) (plurality opinion) (upholding application of a membership goal because, among other things, it was not being "used simply to achieve and maintain racial balance"); *Weber*, 443 U.S. at 208, 99 S.Ct. at 2730 (upholding an affirmative action plan that "is not intended to maintain racial balance, but simply to eliminate a manifest racial imbalance").

**30.** In concluding that the standards set out in *Rufo* were applicable to requests to modify decrees in employment discrimination class actions, one court has said: "Unlike purely commercial consent decrees which involve only the parties to the subsisting litigation, this case, like those in the institutional reform arena—wherein consent decrees were executed, for example, to correct unconstitutional conditions existing in prisons or to remedy the existence of racial segregation in certain of the nation's schools—implicates the public's interest in seeing that persons are not deprived of fundamental rights." *Patterson*, 797 F.Supp. at 1180 n. 8. *See also* Hooks, 26 Ga.L.Rev. at 1043 (one of the distinctive traits of institutional reform litigation is "the probability of impact upon nonparties").

**31.** 286 U.S. at 114–15, 52 S.Ct. at 462 (citation omitted).

**32.** 990 F.2d 653, 659–660 (1st Cir.1993) (citations omitted).

*terson*, 797 F.Supp. at 1179 (affirmative action provisions of the decree "were provisional only— they were to last until the vestiges of racial discrimination in the industry had been removed").

### C. Nature of the inquiry in this case

The purpose of the agreed upon decree in this case between the United States and the City of Miami was the elimination of illegal discrimination in the employment practices of the City. A second purpose was to redress the consequences of past discrimination.

The foundation for requiring affirmative action on the part of the City of Miami lies in the prefatory sentence in paragraph 5 of the consent decree: "In order to eliminate the effects of past discriminatory practices against blacks, Latins and women, the City shall adopt...." While appellant argues that the past effects have been eliminated, we find that this subject was not adequately ventilated. Later in this opinion we shall address the responsibility of the parties, particularly the City, to seek an end to the district court's supervision of the City's employment practices in each of its departments as soon as the effects of past discrimination have been eliminated and redress has been made to those affected by past discrimination.

The 1990 Order on appeal was based upon 1980 census figures that reflected labor force availability figures of 19.1% Anglo, 21.4% Black, 59.5% Hispanic, and 45.9% Females. There is no evidence to our knowledge to reflect the number of applications for employment from each of these groups. Ascertaining the proportion of qualified *applicants* from each favored group would seem necessary before determining whether affirmative action should continue with respect to both initial hires as well as promotions, since the base may be skewed because of a lack of interest by a particular favored group.

Our review confirms that the City of Miami has conscientiously attempted to eradicate discrimination in its initial hiring and promotion practices. However, our experience teaches us that on some occasions public employers prefer the supervision of a federal court to confronting directly its employees and the public.[33] We urge the City to seek termination of the decree as soon as possible. In fact, one appropriate inquiry for the district court to make is whether any party wishes to continue the consent decree and, if so, why.

We conclude from the record before us that there has been no specific judicial inquiry as to whether there is an "evidentiary or legal basis" for termination or modification of the consent decree.[34] We do not necessarily agree with the district court that because there is an underrepresentation of minorities and women in the promotional ranks of the Fire Department the "basic objectives" of the decree have not been achieved. Paragraph one of the decree enjoins the City from engaging in discriminatory actions or practices. There is nothing in the record to our knowledge that indicates the City has engaged in any discriminatory practices since the decree was entered March 31, 1977. Paragraph 5, which sets out the long term goal of work force parity, begins with the phrase, "In order to eliminate the effects of past discriminatory practices against blacks, Latins and women," and ends with the sentence, "The purpose of this goal is to eliminate the substantial underrepresentation and uneven distribution of blacks, Latins and women throughout the City's work force." Considering this language and the consent decree as a whole, we believe that

---

**33.** After this case reached our court but before oral argument, the district court was required to hear a motion to determine the appropriateness of certain promotions within the Fire Department respecting the failure to promote two males of Hispanic descent. The appellant has requested we consider the district court's denial of relief. We deny the request.

We point this out to illustrate the difficulty created when a district court is required to settle such disputes. Fla.Stat. §§ 447.201, *et seq.*, prescribes the rights of public employees, state, county, and city; creates a Public Relations Commission to adjudicate grievances unresolved by the employer and employee; and provides for

judicial review by the state courts. Additionally, Fla.Stat. § 760.01, *et seq.*, creates a Commission on Human Relations, which attempts to reconcile unlawful employment practices and provides for judicial remedies if necessary.

The controversy respecting promotion of the two Hispanics should not flow from the 1977 consent decree; it belongs within the jurisdiction of the State. However, we understand the dilemma of the district court.

**34.** As noted above, the district court was without the benefit of *Rufo* or *Dowell* when it decided that there was no basis for termination or modification of the decree.

**1508**

the basic objective of the decree was to eliminate discrimination and the effects of past discrimination, which effects included the gross underrepresentation of minorities and women in certain segments of the City's work force. The long term goal of work force parity, or the shorter term goals regarding promotions and hiring, were not the "basic objectives" of the decree. Rather, these goals were a means of achieving and measuring progress toward the ultimate purpose of eliminating the effects of past discrimination. The real aim is non-discrimination: not achieving parity is a failure if caused by discrimination, but not a failure if due to factors other than discrimination.[35]

Work force parity may never be achievable because of shifting demographics and imbalances in the numbers of qualified applicants for various jobs due to differing ambitions, education, language requirements, physical characteristics, etc., of persons in the favored groups. If there is work force disparity that cannot be attributed to past discriminatory employment practices of the City of Miami, such disparity is no reason for keeping in force this consent decree.

Thus, on remand, the district court must determine whether the decree's basic purpose of eliminating the effects of past discrimination has been achieved in the Fire Department. In making this determination, the district court must certainly consider the Fire Department's progress, or lack thereof, toward the long term goal of work force parity. But while progress toward this goal

may be evidence bearing upon whether the basic purpose of the decree has been achieved, it is not the determining factor.[36] In determining whether the decree's purpose has been fulfilled, the district court should consider whether the City has "complied in good faith" with the decree and whether the vestiges of past discrimination have "been eliminated to the extent practicable." [37] As to the City's good faith, the district court should consider the City's record of compliance with the decree,[38] as well as the City's other affirmative action undertakings. As to the elimination of the vestiges of past discrimination, the school desegregation cases teach us that there is no duty to remedy an imbalance that is not caused by past discrimination so long as the City' current employment and promotional policies and practices are neutral with respect to race, gender, and ethnicity.[39] Thus, the district court must determine whether the current underrepresentation of favored groups in the promotional ranks of the Fire Department is a vestige of past discrimination, or the result of other neutral causes, such as a nondiscriminatory seniority system and other factors we have discussed.[40] In sum, termination of the consent decree would be appropriate if the district court finds that the decree is clearly no longer necessary either to prevent discrimination in the future or to remedy the effects of past discrimination.[41]

 Even if the district court determines that termination of the decree is not warranted, modification may be appropriate.

---

**35.** See Robert K. Fullinwider, *The Reverse Discrimination Controversy,* Chapter Eleven (1981).

**36.** Indeed, if it were the sole determining factor, the consent decree would likely remain in force indefinitely given the Department's lack of success in recruiting women.

**37.** *Dowell,* 498 U.S. at 250, 111 S.Ct. at 638.

**38.** Because the district court determined that the basic objectives of the consent decree had not been achieved, the court found it unnecessary to determine whether the City had "substantially complied" with the decree. On remand, the district court must reach the substantial compliance question to determine whether the City has acted in good faith.

**39.** *Freeman v. Pitts,* —— U.S. at ——, 112 S.Ct. at 1447.

**40.** For example, the substantial underrepresentation of women in the Fire Department may be the result simply of disinterest on the part of women. The City has no duty to remedy the underrepresentation *so long as* this disinterest is in no way tainted by past discrimination, as it would be, for example, if the Department's reputation for discrimination discouraged women from seeking employment. *See Local 28 of Sheet Metal Workers,* 478 U.S. at 449, 106 S.Ct. at 3036 (plurality opinion).

**41.** *See Patterson,* 797 F.Supp. at 1181 ("To maintain the temporary affirmative action provisions provided for in the Settlement Agreement after they have served their stated purpose would not only be beyond the intent of the parties but would also infringe on the legitimate expectations of non-minority employees.").

Local 587 contends that the decree should be modified so that the promotional goals are based on the number of qualified applicants only. It is well established that, in determining whether there is a work force imbalance that justifies affirmative action remedies, the proper comparison is between the minority composition of the work force in question and the *qualified* minority population in the relevant labor market.[42] This alone does not, however, justify the modification Local 587 seeks. In *Rufo*, the Supreme Court made clear that the party seeking modification must establish "a significant change in facts or law":

> Ordinarily ... modification should not be granted where a party relies upon events that actually were anticipated at the time it entered into a decree.[43]

The Supreme Court also made clear that:

> A proposed modification should not strive to rewrite a consent decree so that it conforms to the constitutional floor. Once a court has determined that changed circumstances warrant a modification in a consent decree, the focus should be on whether the proposed modification is tailored to resolve the problems created by the change in circumstances.[44]

Thus, on remand, the district court must determine whether circumstances that arguably were not anticipated by the parties to the decree warrant its modification, and whether the modification proposed is tailored to resolve the problem presented. For example, the district court may determine that the parties in good faith did not anticipate the difficulty of recruiting certain groups, such as women, into the Fire Department and that this unanticipated difficulty warrants some modification of the goals with respect to these groups. We caution that we do not mean to sanction the modification of long-standing goals in consent decrees merely because the goals have not been achieved. But when, for reasons unrelated to past discrimination or to the fault of the parties, goals unnecessary to the achievement of the basic purposes of the decree will either never be met or will be met only with great difficulty, modification may be appropriate.

We conclude by noting that a district court's decision on a request to terminate or modify a consent decree is an exercise of that court's equitable power:

> The essence of a court's equity power lies in its inherent capacity to adjust remedies in a feasible and practical way to eliminate the conditions or redress the injuries caused by unlawful action. Equitable remedies must be flexible if these underlying principles are to be enforced with fairness and precision.[45]

We remand for the district court to exercise this power.

## CONCLUSION

For the reasons articulated above, we VACATE the district court's decision and REMAND the case for further proceedings consistent with this opinion.

---

42. *Johnson v. Transportation Agency, Santa Clara County, California,* 480 U.S. 616, 632–33, 107 S.Ct. 1442, 1452, 94 L.Ed.2d 615 (1987); *Wygant v. Jackson Board of Education,* 476 U.S. 267, 275, 106 S.Ct. 1842, 1847, 90 L.Ed.2d 260 (1986) (plurality opinion).

43. —— U.S. at ——, 112 S.Ct. at 760.

44. *Id.* at ——, 112 S.Ct. at 764.

45. *Freeman v. Pitts,* —— U.S. at ——, 112 S.Ct. at 1444.