The BROTHERHOOD OF MIDWEST GUARDIANS, INC., a Nebraska Non-Profit Corporation; and James Patterson, Isaiah Jackson, and Markita Smith, for Themselves and on Behalf of All Others Similarly Situated, Plaintiffs-Appellees,

v.

CITY OF OMAHA, a Municipal Corporation, Defendant-Appellant,

and

Al Veys, Richard Anderson, and Henry Dogin, Defendants.

UNITED STATES of America, Plaintiff-Appellee,

v.

CITY OF OMAHA; Richard R. Anderson, and His Successors in Office in His Capacity as Chief of Police; and D.J. Tisdale, and His Successor in Office in His Capacity as Personnel Director, Defendants-Appellants.

No. 93–1278.

United States Court of Appeals, Eighth Circuit.

Submitted Sept. 17, 1993.

Decided Oct. 28, 1993.

Rehearing and Suggestion for Rehearing En Banc Denied Dec. 22, 1993.

Wendy E. Hahn, Omaha, NE, argued (Herbert M. Fitle and James E. Fellows, appeared on the brief) for appellants.

Robert V. Broom, Omaha, NE, argued for plaintiffs-appellees.

Before McMILLIAN, WOLLMAN, and MORRIS SHEPPARD ARNOLD, Circuit Judges.

MORRIS SHEPPARD ARNOLD, Circuit Judge.

Plaintiffs below appeal from a ruling refusing to dissolve a consent decree entered almost thirteen years ago in a case complaining that the City of Omaha had engaged in a pattern of discrimination based on race in all

aspects of employment in the Omaha police department. The decree provided that it would expire "[u]pon defendants' showing of achievement of the goals of this Decree and maintenance of those goals for a period of one year." Because plaintiffs made the requisite showing in the court below, we reverse.

## I.

At issue primarily in this case is the proper interpretation of the word "goals." Appellants insist that the word refers specifically to those portions of the decree that deal with the percentage of minority representation in its work force that the appellants were specifically ordered eventually to achieve. Appellees, on the other hand, urge us to hold that the word refers broadly to all the objects of the decree, in other words, to everything that the decree directed appellants to do. We recognize the plausibility of appellees' posited construction, but, on balance, we believe that appellants have the better of the argument.

## A.

■ First of all, we observe that the word "goals" is a narrow term of art, a word with a well-known and fixed technical meaning, in the context of affirmative action plans. It refers to numerical goals, actual employment figures that an employer is striving to achieve. *See, e.g.,* 29 C.F.R. § 1607.17(3)(a), § 1608.4(c), § 1608.4(c)(1), § 1608.4(c)(2)(ii), and 41 C.F.R. § 60–2.12, § 60–2.13(e), § 60–3.17(3)(a), § 60–4.6. *See also, e.g., Lilly v. City of Beckley, West Virginia,* 797 F.2d 191, 195 (4th Cir.1986); *Kilgo v. Bowman Transportation, Inc.,* 789 F.2d 859, 879, 879 n. 2 (11th Cir.1986); *United States v. National Association for the Advancement of Colored People, Inc.,* 779 F.2d 881, 882–83 (2d Cir. 1985), *cert. denied,* 478 U.S. 1020, 106 S.Ct. 3333, 92 L.Ed.2d 739 (1986); and *Equal Employment Opportunity Commission v. Local 638 ... Local 28 of the Sheet Metal Workers' International Association,* 753 F.2d 1172, 1186, 1188 (2d Cir.1985), *aff'd,* 478 U.S. 421, 106 S.Ct. 3019, 92 L.Ed.2d 344 (1986). *See also Local 28 of the Sheet Metal Workers' International Association v. Equal Employment Opportunity Commission,* 478 U.S.

421, 486 n. 1, 486–89, 106 S.Ct. 3019, 3055 n. 1, 3055–3057, 92 L.Ed.2d 344 (1986) (Powell, J., concurring). In a decree such as this one, then, the legal mind (at least one thoroughly acquainted with this area of the law) will ·naturally be inclined to think immediately of numbers when it encounters the word "goals," and that furnishes some evidence of the meaning intended by those who drafted the decree.

■ Second, almost everywhere that the word "goals" appears in the decree, it refers quite unequivocally to numerical targets. For instance, in paragraphs 8, 9, 10, and 11 of the order, the most detailed and specific part of it, the word "goal" or "goals" is used at least thirteen times. The "long-term goal" set there is the achievement of an overall work force that contains 9.5% black officers (more on this later), and the order continues by outlining certain "interim goals" of a numerical character that will contribute incrementally to the ultimate, long-term end. The only place in the order that the word "goals" might even colorably be interpreted to refer to the decree's general objects is in paragraph 6, which deals with possible lawsuits against the City of Omaha for actions taken by it "pursuant to and in furtherance of the goals and intentions of this Decree." Even if we were to concede, which we do not, that the reference here is not to numerical targets, the very uniqueness of this use of the word would provide further proof of the strength of appellants' position.

## B.

The district court identified some other portions of the order that it characterized as goals: An assertion that all parties share the goal of ensuring equal employment opportunity (paragraph 5); a direction not to engage in any act or practice that has the purpose or effect of discriminating against blacks (paragraph 6); an order not to retaliate (paragraph 7); an injunction to make all good-faith efforts to utilize black officers where they have not been used before (paragraph 12); and a direction to allow black officers equal access to training courses (paragraph 13). With the exception of the first of these

(which is no more than a polite preamble without objective substance, a declaration of goodwill), these parts of the decree do not create any substantive, objectively enforceable duties of a specific character that the general legal principle against discrimination had not already imposed by law. They tell the City of Omaha to do no more than it was already obligated to do and continues to be obligated to do. We think that it would be odd to describe these orders as goals of the decree, odder still to allow a dissolution of it if these goals were "achieved and maintained" for a year. The object of a dissolution is to free the obligated party from compliance with an order, something that cannot occur if these orders are construed as goals, for the law continues to constrain them to obey it. We note, moreover, that it would be impossible for the appellants to prove that they had obeyed the law for a year. On the other hand, it makes perfect sense to release someone from a decree after achieving a numerical goal and maintaining it for a year.

## II.

■ Based on the evidence presented to it, the court below found that appellants had in fact met the numerical goals, but refused dissolution because they had not demonstrated that they had done the other things that the decree had directed. Appellees maintain, however, and appellants agree, that the court erred in finding what the numerical goals were. The court held that the decree required only that the City of Omaha achieve 9.5% black representation in its overall work force; both parties urge us to hold that the order mandated 9.5% black representation at each of the ranks in the police force. The parties assert, and we believe them, that they have consistently taken this position ever since the effective date of the decree. They further direct our attention to paragraph 8(b) of the decree, which provides, with regard to "promotional sworn positions" in the department, that "the interim goal shall be to appoint qualified blacks in at least the proportion that these groups are represented in the classes of employees eligible for promotion." What this seems to mean is that if there were, say, 5% blacks at ranks eligible for promotion, then at least 5% of the pro-

motions to lieutenant ought to be black over the period given to achieve the interim goal. The parties appear to argue that this necessarily means that the ultimate aim of the decree was the achievement of the minimum of 9.5% black officers at all ranks. We do not follow this argument. An overall work force of 9.5% black could be arrived at after a literal achievement of this interim goal without having all of the ranks at a minimum of 9.5% black. We need to remember, moreover, that these are goals, not rigid quotas, and there are other parts of the decree that could be looked to to excuse their achievement. We therefore find this particular argument unconvincing.

A more difficult point has to do with the appellants having adopted a litigation posture in other cases to the effect that the decree required them to achieve 9.5% black representation at each rank in the relevant work force. In one of these cases, *Donaghy v. City of Omaha,* 933 F.2d 1448, 1453 (8th Cir.1991), *cert. denied,* —— U.S. ——, 112 S.Ct. 938, 117 L.Ed.2d 109 (1992), a reverse discrimination case, we held that the decree required the city to promote a qualified black applicant to a lieutenant's position because "only 3.2% of the lieutenants were black, while 10.7% of those eligible to be promoted to lieutenant were black." *See also id.* at 1461–62, n. 14. We see nothing in this holding to support the parties' proposed construction of the decree, nor do we feel in any way estopped by it from adopting an interpretation contrary to the one that the parties are urging. In *Palmer v. City of Omaha,* No. 90–0–318 (D.Neb. June 19, 1990), another reverse discrimination case (this one by a white female), the defendant set up the consent decree as a defense to its hiring practices. The court held for the city on the ground that the consent decree compelled (or at least permitted) the hiring action that it took; but the court specifically declined to adopt the city's interpretation of the decree, saying that it "need not resolve those issues at this time." *Id.* at 7, n. 3. Instead, it simply noted that the city's construction was "a fair interpretation." *Id.* Finally, the parties cite us to *Cavanaugh v. City of Omaha,* No. 89–0–489 (D.Neb. filed July 27, 1989, judgment entered September 23, 1992), yet another

reverse discrimination suit. In that case, the district court instructed the jury that "[f]or purposes of deciding this case, you are to assume that [the city's] interpretation was correct as a matter of law." This ambiguous and oblique circumlocution seems to us at the least to reveal some doubt on the court's part as to the meaning of the decree, and without more context, which the parties have not provided, we are unwilling to ascribe any estoppel effect to this case, even if one were available under the general rules relating to issue preclusion.

The decree, as the district court pointed out here, says very plainly that the ultimate goal is to achieve "an overall workforce" that is 9.5% black. A work force that is 9.5% black at all levels, of course, meets this objective, but we see nothing in the decree that requires that mode of achieving the long-term goal. We therefore agree with the district court's interpretation, and find its factual finding that the long-term goal has been met not to be clearly erroneous.

### III.

We note, finally, the principle that affirmative action consent decrees are not favored unless they are "temporary and will terminate when the manifest [racial] imbalances have been eliminated." *Paradise v. Prescott*, 767 F.2d 1514, 1531 (11th Cir.1985), quoting *United States v. City of Alexandria*, 614 F.2d 1358, 1365 (5th Cir.1980). We find in this principle a useful constructional aid in this case.

For the reasons indicated, we therefore reverse the judgment of the district court and remand for the entry of judgment in favor of appellants dissolving the consent decree.

McMILLIAN, Circuit Judge, concurring in part and dissenting in part.

For the reasons discussed below, I concur in part and dissent in part. I concur in the majority opinion's analysis in Part I discussing the proper interpretation of the word "goals" and agree that, at least in the specialized context of affirmative action plans and employment discrimination class actions, the word "goals" means numerical goals. I also note that, again in the specialized context of affirmative action plans, employment dis-

crimination class actions and institutional reform litigation, the current word of choice for the general objectives of such litigation would appear to be "purpose," or, more precisely, "basic purpose." *Rufo v. Inmates of Suffolk County Jail,* —— U.S. ——, ——, 112 S.Ct. 748, 762, 116 L.Ed.2d 867 (1992); *see United States v. City of Miami,* 2 F.3d 1497, 1503–1505 (11th Cir.1993).

I do not agree with the majority opinion's analysis in Part II discussing what the numerical goals were and, accordingly, dissent from that part of the majority opinion. I would accept the parties' interpretation of the numerical goal as mandating 9.5% black representation at each rank of the police force as opposed to 9.5% black representation in the police force overall. Unlike the majority opinion, I think the parties' interpretation of the numerical goal is consistent with the interim goal set forth in paragraph 8(b) of the consent decree with respect to promotions. I cannot believe that the police department could satisfy the consent decree's 9.5% goal if, for example, all or most of the black police officers were patrol officers and all or most of the supervisory officers were white.